[No. S152667. Feb. 19, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES DANIEL SOPER, Defendant and Appellant.

**COUNSEL**

David M. McKinney, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck, David Delgado-Rucci, Steve Oetting and Raymond M. DiGuiseppe, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Within approximately four months, two homeless men who camped about three miles apart were killed at night as they slept on their backs. Heavy objects found near their campsites had been dropped on their respective foreheads. Forensic and testimonial evidence tied defendant to both crime scenes and to both victims. Although initially he was charged separately with each murder, the cases subsequently were joined for a single trial. After the trial court rejected defendant's motion to sever, a jury convicted him of first degree murder in one case and second degree murder in the other. (Pen. Code, § 187.)[1] Concluding that the joined murder charges should have been severed and tried separately, the Court of Appeal reversed and ordered separate new trials.

We conclude that the Court of Appeal erred in finding that the trial court abused its discretion by failing to sever the charged offenses.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The jury also found that defendant personally used a firearm in the commission of the offenses. (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23).) In separate proceedings, the jury further found that defendant had served four prior prison terms (§ 667.5, subd. (b)) and had suffered one prior strike conviction under the "Three Strikes" law. (§ 667, subds. (b)–(i).) The trial court sentenced defendant to 86 years to life in prison.

## I

We adopt, with supplementation and stylistic changes, the Court of Appeal's factual recitation, as follows.

## A

George Rigby, who was homeless, camped on a golf course behind a Sav-On drug store in the City of Oceanside. At approximately 8:00 a.m. on Sunday, May 23, 2004, several golfers found Rigby's dead body on a piece of cardboard at his campsite.

Oceanside Police Officer Roy Monge responded to the scene. While there, a woman, Tina Torres, told Monge that a "mean guy" named "Jay Soper" frequently visited Rigby at his camp.

Among the items found around Rigby's campsite was an unopened package of crackers. Defendant's fingerprints were found on the package. Bloodstains were found on a paper bag near Rigby's body, as well as on the cardboard underneath his body, near his hip and knee. DNA testing conducted on these bloodstains matched specimens taken from defendant.

The golf course landscaping crew had used railroad ties to fashion steps. A railroad tie that weighed approximately 30 to 40 pounds was on the ground near Rigby's body. Bloodied hairs found on the railroad tie were linked to Rigby by DNA testing. Another sample from the railroad tie excluded defendant and Rigby, indicating it belonged to a third, unidentified male. Some of the bloodstains on the back of Rigby's hands also appeared to be linked to the same unidentified male.

There was a depression and a split approximately four inches in length near Rigby's left temple. Dr. Christina Stanley, a medical examiner, testified that Rigby had been killed by blunt force head injuries, and that he probably died the night before his body was found. According to the medical examiner, the lack of blood in the immediate vicinity of Rigby's body suggested he had died from a single blow. In addition, an injury to the back right side of Rigby's head indicated he had been lying down at the time of the killing. Rigby's jacket pocket was open, and no money was found on his person or in the vicinity.

Several witnesses testified they had seen defendant with Rigby at his camp on the day before Rigby's body was discovered. For example, Doris Daniel and her boyfriend Lewis Mungin saw Rigby and defendant together at Rigby's camp at approximately midnight—about eight hours before Rigby's

body was found. Jeffrey Nash testified that he and others played cards with defendant and Rigby at the camp the day before Rigby's body was found. Nash stated that defendant became upset with Rigby while playing cards, pushed Rigby, and argued with him throughout most of the game. Kenneth Whitaker testified that he shared a drink with Rigby and defendant the morning before Rigby's body was discovered.

Richard Wagner, an acquaintance of defendant's, testified that three or four months after the Rigby homicide, defendant told him that he was "on the run" because the police were looking for him.

## B

On Thursday, September 16, 2004, City of Carlsbad police officers discovered James Olson's decomposing body at his campsite in a drainage ditch on a hillside behind a Sav-On drug store in Carlsbad. The location was approximately two to three miles from the scene of the Rigby homicide. Olson was lying in a sleeping bag, and there was a block of concrete resting on his legs.

According to Dr. Christina Stanley, the medical examiner, Olson had suffered crushing head injuries. Police officers found defendant's fingerprint on a jar of peanuts three or four feet from Olson's body. Blood containing DNA that matched DNA samples from Olson was found on the concrete block. DNA testing also revealed that defendant could neither be identified nor excluded as the donor of other blood samples taken from the concrete block. One of Olson's pants pockets was partially turned inside out and was empty; still, he had $9 in his pants change pocket.

Dr. Stanley concluded that Olson had been dead for several days, and possibly for as long as a week, before his body was discovered. Dr. Stanley further concluded that Olson died from blunt force head injuries, and that it was likely these injuries were inflicted by means of the concrete block found at the scene. Brian Kennedy, a crime scene reconstruction expert, testified that in his opinion, Olson probably died from a single blow from the concrete block.

John Rogers, a transient, knew Olson for 10 years, and met defendant approximately two weeks before the discovery of Olson's death. Defendant told Rogers that his name was Richard Perry. The police investigated Rogers to determine his possible involvement in the homicide. DNA testing of blood samples taken from the concrete block excluded Rogers as a contributor. Rogers identified a pocketknife found at Olson's camp as his own, but said that defendant had stolen it from him about two weeks earlier. Neither fingerprints nor DNA were found on the knife.

Rogers explained that he had been with defendant and Olson on the Saturday evening (Sept. 11) before Olson's body was discovered. Rogers said that the men had watched a band perform at the Coffee Bean, a local coffee shop located near Olson's camp. Rogers testified that at approximately 8:30 p.m. Olson left to purchase a beer, but soon returned to the Coffee Bean. Shortly thereafter, Olson departed for his camp. According to Rogers, as Olson was leaving, defendant told Olson that he would accompany Olson to his camp to have a beer. Rogers further testified that he saw Olson shake his head "no" in a manner indicating that Olson was frightened. Defendant followed Olson out of the Coffee Bean, and this was the last time Rogers saw Olson alive.

On Thursday, September 16, 2004, Carlsbad Police Officer William Michalek responded to the scene of the Olson homicide and attempted to locate other homeless persons in the area who might have information concerning the matter. Michalek encountered Rogers and defendant sitting together at the coffee shop where, Rogers later testified, he had been with defendant and Olson on the previous Saturday evening. When Officer Michalek asked Rogers and defendant for their names, Rogers gave his real name and defendant told Michalek that his name was "Richard Perry." After a brief conversation, Michalek left. Later that same day, after Michalek had gathered more information about the killing, he attempted to locate Rogers and defendant. Michalek located Rogers, who accompanied him to the police station and provided an oral swab and a fingerprint. Michalek was unable to locate defendant, and informed other police officers that he would be interested in speaking with defendant.

## C

On September 19, 2004, Carlsbad Police Officer Paul Reyes noticed defendant standing at a freeway off-ramp holding a sign that read, "Please help if you can. Disabled. God Bless"—activity that, Officer Reyes testified, is illegal. Officer Reyes made contact with defendant, who told Reyes that his name was "Richard Perry." Officer Reyes issued defendant a citation.

Following this encounter, defendant consented to speak with Carlsbad police detectives. In response to their questions concerning the Olson killing, defendant denied ever having been at Olson's campsite or even knowing the victim. He also denied recognizing or ever having possessed the pocketknife that was found at Olson's camp. Eventually officers learned through a fingerprint comparison that the person claiming to be Richard Perry was in fact defendant James Daniel Soper. After determining there was an outstanding parole violation warrant for defendant, the police arrested him.

Defendant was given *Miranda* advisements (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) and agreed to speak further with detectives from the Oceanside and Carlsbad police departments. The detectives conducted several additional audiotaped and/or videotaped interviews of defendant in late September 2004.

During these interviews, defendant stated that he regularly consumed large quantities of alcohol and was being treated for alcohol withdrawal. Defendant claimed that because of his alcoholism, he had difficulty recognizing individuals by name. He also exhibited symptoms of alcohol intoxication.

With respect to the Rigby killing, defendant told the detectives that he never had been at the victim's camp. Defendant also stated to the police that he had "no clue" how his fingerprint could have been found on the wrapper at Rigby's camp, and denied visiting that site because, he explained, it was "hot"—meaning that the police often were there. Defendant made somewhat inconsistent statements concerning whether he knew Rigby, and how well he knew him. During questioning, defendant denied ever getting into a fight with "George," denied knowing him, and then admitted seeing him "around . . . a million times," although, defendant maintained, he had never been formally introduced to Rigby. After the detectives asked defendant to consider whether there was any reason his fingerprints would be found at Rigby's camp, they left the interview room. While defendant was alone in the room, the camera and audio recorder continued to record. Defendant groaned and stated, "I'm going to throw up."

With respect to the Olson killing, the detectives showed defendant a picture of Olson and asked defendant whether he knew the name of the person depicted in the photograph. Defendant stated that he did not know the person's name. Defendant told the detectives he was familiar with the area behind the Sav-On drug store where Olson had been killed, but never had been in that area.

The prosecution introduced evidence concerning the nature of the two homicides as compared with others that had been committed in the Oceanside and Carlsbad areas. Steven Walter, an Oceanside Police Department criminal analyst, testified that no other homicide in the area during the five years preceding the Rigby and Olson matters involved the killing of a transient at his or her camp. Walter also stated that no other homicide during that period involved a "weapon of opportunity"—an object obtained by the perpetrator in the immediate vicinity of the killing; nor was any other killing perpetrated by a single fatal blow to the head. Brian Kennedy, the crime scene reconstructionist, testified that despite his having investigated several hundred prior homicides, he never had encountered a case in which a transient was killed at

his or her campsite while lying down or sleeping. Kennedy further testified that most homicides accomplished by blunt force trauma involve multiple blows—as opposed to the single blows that killed Rigby and Olson—and added that he found the similarities between the two cases "striking." Finally, Dr. Stanley, the San Diego County medical examiner who investigated both cases and conducted both autopsies, testified that she was "struck by the similarities" apparent at the respective crime scenes.

## D

At trial, defendant challenged both his identity as the perpetrator and his ability to form the requisite intent to kill. In order to explain why his own blood was found at Rigby's camp, he presented evidence establishing that he suffered a serious facial wound in late April 2004, requiring surgery. Defense counsel argued that the surgery may have caused defendant's face to bleed periodically during the time in question. Ronald Marquez, a registered nurse at the Vista Detention Facility, testified that on September 19, 2004, after observing defendant exhibit symptoms consistent with alcohol withdrawal, he treated defendant at the jail with Librium, an antianxiety medication.

The jury convicted defendant of the first degree murder of Rigby and of the second degree murder of Olson.

## II

Originally, the district attorney filed separate charges in each case—first in the Rigby matter, and then in the Olson matter. Thereafter, the prosecution filed a single amended complaint alleging two counts of murder, and moved to consolidate the two charges under section 954. That section provides in relevant part: "An accusatory pleading may charge two or more different offenses *connected together in their commission*, or different statements of the same offense or two or more different offenses *of the same class of crimes or offenses*, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." (*Ibid.*, italics added.) The statute also provides that "the court in which a case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (*Ibid.*, italics added.)[2]

In support of its motion, the prosecution, relying upon the information known at that time (and subsequently developed later that day at the

---

[2] The statute further provides: "The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of

preliminary hearing),[3] asserted that evidence underlying both cases would be relevant and admissible under Evidence Code, section 1101, subdivision (b),[4] and also would be cross-admissible, even if there were separate trials on the two charges, based upon two grounds: First, the prosecution argued, evidence pertaining to one charge would establish, for purposes of the other charge, "intent to kill, as opposed to an intent to inflict some non-lethal injury. It [would] disprove[] a wide variety of possible excuses that would fall within the category of a 'drunken mistake.' " Second, the prosecution argued, evidence pertaining to one charge would establish, for purposes of the other charge, common plan and identity.

After the preliminary hearing was conducted and defendant was held to answer, but before the trial court ruled on the motion to consolidate, defendant asked the court to exercise its discretion under section 954 to sever the charges, arguing that the evidence would not be cross-admissible at separate trials and that joinder posed an undue risk of prejudice. Defense counsel conceded in a declaration, however, that "[a]rguably there are at least

---

any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court . . . . An acquittal of one or more counts shall not be deemed an acquittal of any other count." (§ 954.)

With the adoption of Proposition 115 by initiative in 1990, section 954.1 was added, providing: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, *evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact.*" (Italics added.)

[3] The evidence adduced at the preliminary hearing was substantially similar to the evidence later presented at trial and described, *ante,* in part I. As the People explain, the following additional evidence was presented at the preliminary hearing, but *not* at trial: "On August 3, 2004, police interviewed Karen Stahnke. Stahnke asked to speak to the police about the Rigby case after she was arrested on drug-related charges. She told them that, sometime after the Rigby murder, she 'got high' with [defendant] in the Oceanside area. During this time, [defendant] admitted killing Rigby, saying 'I didn't mean to kill him, and I didn't want him to die. Things had just gone wrong.' Stahnke had used methamphetamine the night before her interview with [the] police. [¶] [Moreover, according to an investigating police officer, at] some time before Olson was murdered, he asked individuals at the coffee shop nearby his campsite to help him get away from [defendant] because [defendant] was harassing him."

[4] Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

two major issues in dispute as to both charges: *intent* and *identity*." (Italics added.) The prosecution filed responsive papers.

At a subsequent hearing on the motion, the trial court declined to sever the charges, observing that because the charges were properly joined under section 954, defendant bore a heavy burden of establishing that they should be severed. The court concluded that defendant had failed to carry his burden, in part because there were witnesses common to each case, evidence underlying the two charges would be cross-admissible at separate trials, and the jury in any event would be instructed to decide each count separately. After the trial court ruled that the evidence would be admissible at separate trials for the purposes of establishing both intent and identity, the evidence was received at a joint trial for both purposes. On appeal, the resulting judgment of conviction on both charges was reversed because the Court of Appeal concluded the trial court abused its discretion in refusing to sever the two charges. We granted the People's petition for review.

## III

### A

■ As noted above, pursuant to section 954 an accusatory pleading may charge two or more different offenses so long as at least one of two conditions is met: The offenses are (1) "connected together in their commission," or (2) "of the same class."[5] As defendant concedes, the second alternative is satisfied: the charges not only are of the same class, but they are identical—both counts alleged murder (§ 187). Nor is there any doubt that the two charges are "connected together in their commission." (See generally *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218–1220 [78 Cal.Rptr.3d 272, 185 P.3d 708] (*Alcala*).)

We conclude that the Rigby and Olson charges were properly joined under section 954. Indeed, as we observed in similar circumstances in *Alcala*, these are "precisely the types of cases that the Legislature intended to be tried jointly." (*Alcala, supra*, 43 Cal.4th 1205, 1220.)

### B

■ Article I, section 30, subdivision (a) of the California Constitution provides: "This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature . . . ." As recently described in *Alcala, supra*, 43 Cal.4th 1205, 1218, joint trial has long

---

[5] The statute is quoted more fully, *ante*, at page 769 and in footnote 2.

been prescribed—and broadly allowed—by the Legislature's enactment of section 954. The purpose underlying this statute is clear: joint trial "ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials." (*Frank v. Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119] (*Frank*).) "A unitary trial requires a single courtroom, judge, and court attach[és]. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process." (*People v. Bean* (1988) 46 Cal.3d 919, 939–940 [251 Cal.Rptr. 467, 760 P.2d 996] (*Bean*); see also, e.g., *People v. Geier* (2007) 41 Cal.4th 555, 578 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*) ["consolidation of all three cases served the interest of judicial efficiency"]; *People v. Ochoa* (1998) 19 Cal.4th 353, 409 [79 Cal.Rptr.2d 408, 966 P.2d 442] ["consolidation ordinarily promotes efficiency"]; *People v. Mason* (1991) 52 Cal.3d 909, 935 [277 Cal.Rptr. 166, 802 P.2d 950] (*Mason*) [in a case in which jury selection took more than two months, consolidation promoted efficiency by obviating the need to select an additional jury and "reduced by at least a year the delay in bringing [one of the charges] to trial"]; see generally *People v. Scott* (1944) 24 Cal.2d 774, 778–779 [151 P.2d 517].) Decisions of our sister states, and of federal courts, recognize the same principles. (E.g., *State v. Richards* (1995) 274 Mont. 180 [906 P.2d 222, 227] (*Richards*) [noting "the judicial economy which results from a joint trial"]; *State v. Bythrow* (1990) 114 Wn.2d 713 [790 P.2d 154, 159] (*Bythrow*) [joinder promotes " 'obviously important considerations of economy and expedition in judicial administration' "]; *U.S. v. Acker* (4th Cir. 1995) 52 F.3d 509, 514 [noting " 'domina[nt] concern with judicial economy' "]; *United States v. Armstrong* (9th Cir. 1980) 621 F.2d 951, 954 (*Armstrong*) [same].) For these and related reasons, consolidation or joinder of charged offenses "is the course of action preferred by the law." (*Alcala, supra*, 43 Cal.4th at p. 1220.) Application of this preference has special force in the context of a motion to sever properly joined charges on the ground that joint trial prejudicially would expose a jury to "other crimes" evidence.

It is useful to contrast the situation here at issue—concerning *severance of properly joined charges*—with the analysis employed in the related but different situation posed by the *admission into evidence of facts underlying an uncharged offense*. In the latter situation, as we explained in *Bean, supra*, 46 Cal.3d 919, "the People, as the proponent of the evidence, bear the burden of persuading the judge that the potential prejudice from the jury becoming aware of the uncharged offense is outweighed by the probative value of the evidence. This is [so] because evidence of uncharged offenses is generally inadmissible. (Evid. Code, § 1101 [quoted, *ante*, fn. 4]; [citation].) Admission

of the evidence involves, inter alia, the danger of confusing the issues, introducing collateral matters, or tempting the jury to condemn [the] defendant because he has escaped adequate punishment in the past. (*People* v. *Thompson* (1980) 27 Cal.3d 303, 317, & fn. 18 [165 Cal.Rptr. 289, 611 P.2d 883].) It is therefore appropriate, when the evidence is of an *uncharged* offense, to place on *the People* the burden of establishing that the evidence has *substantial* probative value that clearly outweighs its inherent prejudicial effect. (*Id.* at p. 318.)" (*Bean, supra,* 46 Cal.3d at p. 938, italics added.) In subsequent decisions addressing the admission of evidence underlying uncharged misconduct, we have continued to stress that such evidence " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).)[6]

■ As we also observed in *Bean*, the applicable analysis is significantly different in the context of properly joined charged offenses. (*Bean, supra,* 46 Cal.3d 919, 938–939; see generally *Alcala, supra,* 43 Cal.4th 1205, 1222, fn. 11.) Unlike what occurs in situations involving the admissibility of uncharged misconduct—in which the People bear the burden of establishing that the evidence has substantial probative value that clearly outweighs its inherent prejudicial effect—by contrast, in the context of properly joined offenses, "[t]he burden is reversed." (*Bean, supra,* 46 Cal.3d at p. 938.) In the *latter* setting, "[t]he *prosecution* is *entitled* to join offenses under the circumstances specified in section 954. The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 605 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 173 [222 Cal.Rptr. 184, 711 P.2d 480].) When the offenses are [properly] joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible [under Evidence Code section 352] may be considered as a factor suggesting possible prejudice, but countervailing considerations [of efficiency and judicial economy] that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a . . . motion [to sever properly joined charges]. *The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.*" (*Bean, supra,* 46 Cal.3d at pp. 938–939, italics added; see also *Alcala, supra,* 43 Cal.4th 1205, 1220, and cases cited; accord, e.g.,

---

[6] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

*State v. Day* (R.I. 2006) 898 A.2d 698, 705 (*Day*); *Richards, supra,* 906 P.2d 222, 227; *Bythrow, supra,* 790 P.2d 154, 158–159; *Armstrong, supra,* 621 F.2d 951, 954.)

Not only is the burden allocated differently in cases involving properly joined charges as compared with cases involving the introduction of uncharged misconduct, but the nature of the abuse of discretion standard—and the ensuing method utilized to analyze prejudice, undertaken to determine whether a trial court abused its discretion in a specific case—also are significantly different from what is employed in determining whether a trial court erred in allowing the introduction of evidence of uncharged misconduct. (See generally *Alcala, supra,* 43 Cal.4th 1205, 1222, fn. 11.)

■ A defendant, to establish error in a trial court's ruling declining to sever properly joined charges, must make a " '*clear showing of prejudice* to establish that the trial court *abused its discretion* . . . .' " (*Alcala, supra,* 43 Cal.4th 1205, 1220, and cases cited.) A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling " ' " ' "falls outside the bounds of reason." ' " ' " (*Ibid.*) We have observed that "in the context of properly joined offenses, 'a party seeking severance must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial.' " (*Id.,* at p. 1222, fn. 11, quoting *People v. Arias* (1996) 13 Cal.4th 92, 127 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*).)

Most significantly, the method utilized to analyze prejudice is itself significantly different from that employed in reviewing a trial court's decision to admit evidence of uncharged misconduct. As we observed in *Bean, supra,* 46 Cal.3d 919, 939, among the "countervailing considerations" present in the context of severance—but absent in the context of admitting evidence of uncharged offenses at a separate trial—are the benefits to the state, in the form of conservation of judicial resources and public funds. (*Id.,* at pp. 939–940.) As explained below, these considerations often weigh strongly against severance of properly joined charges.

■ In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, "we consider the record before the trial court when it made its ruling." (*Alcala, supra,* 43 Cal.4th 1205, 1220.) Although our assessment "is necessarily dependent on the particular circumstances of each individual case, . . . certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." (*Frank, supra,* 48 Cal.3d 632, 639.)

First, we consider the cross-admissibility of the evidence in hypothetical separate trials. (*Alcala, supra,* 43 Cal.4th 1205, 1220.) If the evidence

underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. (*Id.*, at p. 1221.) Moreover, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges. (*Ibid.*) Indeed, section 954.1 (quoted, *ante*, fn. 2) codifies this rule—it provides that when, as here, properly joined charges are of the same class, the circumstance that the evidence underlying those charges would not be cross-admissible at hypothetical separate trials is, standing alone, insufficient to establish that a trial court abused its discretion in refusing to sever those charges.

If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider "whether the benefits of joinder were sufficiently substantial to outweigh the possible 'spill-over' effect of the 'other-crimes' evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses." (*Bean, supra*, 46 Cal.3d 919, 938; accord, *Day, supra*, 898 A.2d 698, 705; *Richards, supra*, 906 P.2d 222, 227; *Bythrow, supra*, 790 P.2d 154, 158–159.) In making *that* assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. (*Arias, supra*, 13 Cal.4th 92, 127; see also *Alcala, supra*, 43 Cal.4th 1205, 1220–1221, and cases cited.) We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.[7]

Applying these principles, and observing that the statutory requirements for joinder under section 954 have been met in the present case, we proceed to assess defendant's claim that the trial court abused its discretion in denying the motion for severance, clearly prejudicing defendant.

---

[7] In light of the countervailing benefits of a single trial of properly joined charges, we have observed that " '[t]he state's interest in joinder gives the court broader discretion in ruling on a motion for severance [of properly joined charges] than it has in ruling on admissibility of evidence' [of uncharged offenses in a separate trial]. [Citations.]" (*Alcala, supra*, 43 Cal.4th 1205, 1221.)

### 1. *Cross-admissibility of the evidence at hypothetical separate trials*

■ As explained in *Ewoldt, supra,* 7 Cal.4th 380, there exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought: *"The least degree of similarity . . . is required in order to prove intent.* [Citation.] . . . In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Id.,* at p. 402, italics added.) By contrast, a higher degree of similarity is required to prove common design or plan,[8] and the highest degree of similarity is required to prove identity.[9]

■ Defendant asserts that only identity, and not intent, actually was at issue in the joint trial, and hence, defendant claims, only identity—and not intent—would have been at issue in hypothetical separate trials.[10] It was apparent at the time the trial court denied severance that identity was one of

---

[8] As we explained in *Ewoldt*: "A greater degree of similarity is required in order to prove the existence of a common design or plan. [When offered for that purpose], evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 304, p. 249, italics omitted.) '[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.' (*Id.* at pp. 250–251, italics omitted; see also 1 McCormick [on Evidence (4th ed. 1992)] § 190, p. 805.) [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Ewoldt, supra,* 7 Cal.4th 380, 402–403.)

[9] As we further explained in *Ewoldt*: "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. (*People* v. *Miller* [(1990)] 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289].) 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' (1 McCormick, *supra,* § 190, pp. 801–803.)" (*Ewoldt, supra,* 7 Cal.4th 380, 403; see also *People v. Balcom* (1994) 7 Cal.4th 414, 425 [27 Cal.Rptr.2d 666, 867 P.2d 777] [in order to be admissible on the issue of identity, evidence underlying an uncharged offense "must share with the charged offense characteristics that are ' "so unusual and distinctive as to be like a signature" ' " and "virtually eliminate[] the possibility that anyone other than the defendant committed the charged offense"].)

[10] As noted above, in determining whether a court abused its discretion under section 954 in failing to sever properly joined charges, we consider the record existing at the time the court made its ruling. (*Alcala, supra,* 43 Cal.4th 1205, 1220.) We have observed, *ante,* in footnote 3, that in the present case the information available to the trial court when it made its severance ruling consisted of (1) evidence substantially similar to that subsequently presented at trial, *as well as* (2) additional evidence not presented by the prosecution at trial.

the issues (and perhaps the primary one) that would be disputed at trial.[11] As the People observe, however, intent to kill, along with premeditation and deliberation, also was in dispute and would have been at issue in any separate trial as well. The prosecution, of course, must prove each element of its case. Defendant's assertion that his defense to the two charges was bound to focus upon identity, and not intent, would not eliminate the prosecution's burden to establish both intent and identity beyond a reasonable doubt. (See *Alcala, supra*, 43 Cal.4th 1205, 1223.)

In addressing the issue of cross-admissibility, the Court of Appeal below reasoned, first, that the evidence would *not* be cross-admissible on the issue of *identity* at hypothetical separate trials, because the evidence underlying the two charges was not " ' "so unusual and distinctive as to be like a signature." ' " (Quoting *Ewoldt, supra*, 7 Cal.4th 380, 403, set forth more fully, *ante*, fn. 9.) Next, the Court of Appeal determined that although the evidence underlying the two charges would be relevant and potentially cross-admissible on the issue of defendant's *intent* under the lower standard of similarity governing evidence offered for that purpose (*Ewoldt, supra*, 7 Cal.4th at p. 402, quoted, *ante*, at p. 776), nevertheless, because a jury would be tempted to employ that same evidence for the improper purpose of determining identity, the probative value of the evidence in establishing intent would be "outweighed by the possibility of prejudice pursuant to Evidence Code section 352."[12] In the course of its analysis, the appellate court also suggested that in addition to the perceived problem arising under Evidence Code section 352, the evidence would not be admissible at hypothetical separate trials to prove defendant's intent because it was neither conceded, nor could it be assumed, that defendant was the perpetrator of both charged offenses.[13]

In response the People assert, first, that the evidence underlying the two charges would indeed be cross-admissible at hypothetical separate trials on

---

[11] Defendant emphasizes that "it was the leitmotiv of the People's entire case . . . that whoever committed the one offense necessarily committed the other. Considerable evidence was elicited to this effect and this was also the thrust of the prosecutor's closing argument, not to mention his justification for joinder in the first place . . . ."

[12] The Court of Appeal articulated the following analysis under Evidence Code section 352: "While the People argue that the evidence of the two murders was probative to establish that the killer had the intent to kill rather than some less culpable intent, it is clear that the probative value of the evidence for this purpose would be substantially outweighed by the danger that the jury would use the evidence for purposes of determining the identity of the killer. This would be an improper and therefore, unduly prejudicial, use of the evidence because the evidence was not properly admissible for purposes of proving identity. Further, . . . because the entire theory of the prosecution's case at trial was that the evidence was relevant to prove the killer's identity, the potential for prejudice in this case was overwhelming."

[13] In this regard the Court of Appeal quoted language in *Ewoldt, supra*, 7 Cal.4th 380, stating that "[e]vidence of intent is relevant to establish that, *assuming* the defendant committed the alleged conduct, he or she harbored the requisite intent." (*Id.*, at p. 406, italics

both the issue of intent and the issue of identity—and that the trial court was correct in so concluding when it denied the motion to sever and subsequently admitted the evidence for both purposes at the joint trial. The People further contest the Court of Appeal's suggestion (and that of defendant—see, *ante*, fn. 13) that in order to introduce such evidence of *intent*, either it must be conceded or a court must be able to assume that the defendant was the perpetrator in both charged offenses. In this regard, the People assert instead that properly admissible evidence may be considered by a fact finder to prove intent if the evidence is sufficient to sustain a finding "by a preponderance of the evidence" that the defendant committed those other crimes. (Quoting *People v. Carpenter* (1997) 15 Cal.4th 312, 380–383 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*); see Evid. Code, §§ 403, 115.)

■ As we recently observed in *Alcala, supra*, 43 Cal.4th 1205, a fact finder properly may consider admissible "other crimes" evidence to prove intent, so long as (1) the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes (*id.*, at p. 1224 & fn. 14, citing *Carpenter, supra*, 15 Cal.4th 312, 380–383), and further (2) the threshold standard articulated in *Ewoldt* can be satisfied—that is, "the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored" the requisite intent. (*Alcala, supra*, 43 Cal.4th at p. 1224, paraphrasing *Ewoldt, supra*, 7 Cal.4th 380, 402.) There is no requirement that it must be conceded, or a court must be able to assume, that the defendant was the perpetrator in both sets of offenses.

We return to the People's assertion that the evidence underlying the two charges would be cross-admissible at hypothetical separate trials on both the issue of intent and the issue of identity. Clearly, the evidence is sufficient to sustain a finding that defendant was the perpetrator of each of the two offenses,[14] and also satisfies the threshold standard articulated in *Ewoldt*,

added.) Thereafter, the appellate court stated: "This was not a case in which the identity of the perpetrator of the two murders could be assumed, and [in which] the issue for the jury was the nature of the perpetrator's intent in committing the murders."

Defendant expands upon this same point, asserting that unless a "defendant's identity as the perpetrator of the act in question" is either "conceded, or [can be] demonstrated to the point where one is justified in assuming he or she is the perpetrator," evidence of uncharged conduct to prove intent "should be deemed inadmissible." In support, defendant relies upon *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, 166–167 [100 Cal.Rptr.2d 662] (a civil case employing *Ewoldt*'s principles), which observes: "[I]t would make no sense to admit evidence of uncharged misconduct on the issue of intent, motive or lack of mistake or accident where the identity of the actor is not yet determined. Stated otherwise, it would not be relevant to inquire into the issues of intent or motive until it is established the defendant is the person or entity whose motive or intent is at issue."

[14] The homicides occurred within four months of each other at campsites that were within easy walking distance from each other—about two to three miles apart. In each case, forensic evidence tied defendant to the crime scene, and witnesses linked defendant to each victim

*supra*, 7 Cal.4th 380, 402, for admission to prove *intent*.[15] We further agree with the People that the evidence appears to be cross-admissible on the issue of identity, but in an abundance of caution we shall assume for purposes of analysis that (as the Court of Appeal determined) the evidence did not meet the stringent standard for similarity required by *Ewoldt, supra*, 7 Cal.4th at page 403, in order to be admissible on that issue. Accordingly, we also shall assume that the evidence underlying the two offenses would not have been cross-admissible on the issue of *identity* at hypothetical separate trials.[16]

Assuming the absence of a clear finding of "full" cross-admissibility on both contested issues—intent *and* identity—we proceed to weigh the factors indicating potential prejudice against the benefits of joinder. As explained below, we conclude there was no abuse of the trial court's discretion or undue prejudice arising from its failure to sever the two properly joined charges.

### 2. Weighing of factors indicating potential prejudice versus the benefits to the state of joinder

As observed earlier, section 954.1 (quoted, *ante*, fn. 2), provides that when, as here, properly joined charges are of the same class, the circumstance that evidence underlying those charges would not be cross-admissible at hypothetical separate trials is, *standing alone, insufficient* to establish that a trial

---

close to the time of the deaths. In the Rigby case, witnesses testified that defendant played cards with the victim at his camp shortly before his death, and at least one witness (Nash) testified that defendant was upset with Rigby, pushed him, and argued with him throughout the game. In the Olson case, a witness (Rogers) testified that when Olson last was seen alive, defendant said that he would accompany Olson to his camp to have a beer, and as Olson and defendant departed for his camp, Olson had shaken his head "no," indicating to Rogers that Olson was frightened.

[15] As in *Alcala, supra*, 43 Cal.4th 1205, "the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored the intent to kill and that the homicides were premeditated." (*Id.*, at p. 1224.) In each case, the victim was a homeless man, killed by a single blow to the head as he slept at his camp; and in each case the weapon employed was a large and heavy object apparently found by the perpetrator at the camp and discarded at the scene.

[16] Although we are willing to assume for purposes of analysis that the evidence would not have been cross-admissible on the issue of identity at hypothetical separate trials, we do not agree with the Court of Appeal's conclusion (see, *ante*, fn. 12) that absent an affirmative finding of cross-admissibility of the evidence to prove *identity* at hypothetical separate trials, the evidence underlying the Rigby and Olson charges would have been inadmissible for all purposes at such hypothetical separate trials. Specifically, we reject the proposition, inferred by the People from the Court of Appeal's decision, that whenever identity remains at issue—and in the absence of an affirmative finding of cross-admissibility of the evidence to prove identity—evidence underlying uncharged offenses that otherwise would be admissible to prove *intent* always will be inadmissible under Evidence Code section 352 for that purpose. Rather, the admissibility of such evidence would be a matter subject to the trial court's discretion under Evidence Code section 352, after balancing the probative value of the evidence against the potential for prejudice.

court abused its discretion in failing to sever those charges. Accordingly, the assumed absence of cross-admissibility on the issue of identity in the present case is simply one factor to be weighed against the benefits of joinder. (*Frank, supra,* 48 Cal.3d 632, 641.) We turn to the other three factors that often are considered in evaluating such requests (see, *ante,* at p. 775—likelihood to unduly inflame; bolstering of a weak case with a strong one; and conversion of charges into a capital offense), and proceed to weigh all four factors against the benefits to the state of joinder.

The homicides at issue in the Rigby and Olson cases are similar in nature and equally egregious—hence neither, when compared to the other, was likely to unduly inflame a jury against defendant. (See, e.g., *Mason, supra,* 52 Cal.3d 909, 934.) Nor is this a situation in which either charge is a capital offense, or in which the prosecutor sought joinder in order to convert the matter into a capital case. (Cf. *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699] [a case in which "it is the joinder *itself* which gives rise to the special circumstances allegation of multiple murder . . ."].)

Although neither of these two factors militates against the benefits of joinder in the present proceedings, defendant suggests that the remaining factor does: he asserts (and the Court of Appeal found) that the Olson charges were relatively weak compared with the Rigby charges, and that the spillover effect of a joint trial would—and did—unfairly alter the outcome of one or both of the charges.

As an initial matter, based upon the information before the trial court at the time it ruled on the severance motion, it was not clear that the evidence supporting the Olson charge was significantly weaker than that underlying the Rigby charge. In each instance, defendant's fingerprints linked him to the victim's campsite. And in each, witness testimony was proffered, establishing that defendant was in the company of the victim at or near his camp, and was acting in an aggressive fashion shortly before the commission of the homicide. In the Rigby case, testimony was proffered establishing that defendant played cards with the victim at his camp shortly before his death, and at least one witness (Nash) was prepared to testify (and did so at trial) that defendant was upset with Rigby, pushed him, and argued with Rigby throughout the game. In the Olson case, a witness (Rogers) was prepared to testify (and did so at trial) that when Olson last was seen alive as he left the Coffee Bean, defendant said that he would accompany Olson to his camp to have a beer, and that when Olson and defendant departed for the camp, Olson shook his head "no," indicating to Rogers that he was frightened.

Defendant suggests that the evidence supporting the Rigby charge was stronger than that underlying the Olson charge, because DNA identified from

blood samples found on a paper bag and cardboard at Rigby's camp matched DNA from samples taken from defendant, whereas, by comparison, DNA testing of samples from the Olson camp revealed no link to defendant. On the other hand, we note that different DNA evidence taken from the railroad tie found at the Rigby camp excluded both defendant and Rigby, and apparently belonged to a third, unidentified male—a circumstance highlighted by defense counsel in her closing argument to the jury.[17] By comparison, no such forensic evidence concerning a third person was found at the Olson camp— and so in this sense, the Rigby evidence may be seen as more susceptible to challenge than the Olson evidence. Even assuming that, when viewed as a whole, the Rigby evidence may have appeared, at the time of the severance motion, to be somewhat stronger than the Olson evidence, the salient point is that the proffered evidence was sufficiently strong in both cases.

In any event, as between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial "spillover effect," militating against the benefits of joinder and warranting severance of properly joined charges. (*People v. Ruiz, supra,* 44 Cal.3d 589, 606, 607 (*Ruiz*) [severance not required of two properly joined murder charges even though evidence underlying one charge was "relatively weak" and was made "much stronger" by the evidence underlying the second charge].) Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried. (E.g., *Zafiro v. United States* (1993) 506 U.S. 534, 540 [122 L.Ed.2d 317, 113 S.Ct. 933] ["[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."]; accord, *Richards, supra,* 906 P.2d 222, 227.)

Against this showing of potential prejudice, the Court of Appeal considered the benefits of joinder and found them to be "minimal." But, as explained below, the appellate court inappropriately minimized the benefits of joinder.

As the appellate court conceded, a single trial of properly joined charges would promote case-specific efficiencies. The record before the trial court at the time of the severance motion revealed that in the event of separate trials, there would be overlap concerning matters such as the cause of death and the

---

[17] Counsel argued: "We have the murderer's DNA on that weapon. Was it run anywhere? Did you hear any evidence this DNA was run in . . . a data bank? Did you hear any of the [other] homeless people in that area were giving DNA samples?" Later, counsel argued: "Then we heard there was DNA on the victim's hands. . . . Again, we don't know who it is. It was never run through a data bank. No one else was tested. We know it's not [defendant]."

significance of blood sample evidence. Moreover, as the People observe, "[t]he jury would also have to be educated in both cases regarding facts unique to the transient lifestyle," and "[t]he prosecution . . . intended to impeach [defendant] with the same evidence if he testified."

In addition, the Court of Appeal failed to take into account the circumstance that, as a general matter, a single trial of properly joined charges promotes important systemic economies. Whenever properly joined charges are severed, the burden on the public court system of processing the charges is substantially increased. Even assuming that some level of economy might be preserved by (when possible) appointing or assigning the same counsel, investigators, and paralegals to prosecute and defend each charge separately, merely segmenting the proceedings typically will result in inefficiency. For example, each of the numerous procedural steps attendant to any criminal proceeding—such as discovery, pretrial motions, as well as trial sessions themselves—would proceed on discrete tracks. Additionally, when two previously joined matters advance to separate trials, approximately twice as many prospective jurors would need to be summoned and subjected to the selection process.

Further amplifying these and related trial-level inefficiencies resulting from separate trials is the appeal of right afforded to all convicted criminal defendants. Separate appellate records would be compiled by the clerk's offices of the respective trial courts. Even assuming the same appellate counsel could be appointed or assigned to represent the parties, once again merely segmenting the proceedings generally will cause inefficiency. Furthermore, the Court of Appeal, through its own clerk's office, would be required to manage and process discrete appeals, and provide an opportunity for separate oral arguments. Individual written decisions would be drafted, considered, and filed. Subsequently, separate petitions for rehearing could be filed in the Court of Appeal, followed by individual petitions for review in this court. This court, in turn, would need to process, analyze, and dispose of each. Thereafter, separate collateral reviews at the three levels of the federal court system—reprising versions of many of the procedures outlined above—could ensue.

■■■ Although our courts work diligently to ensure due process in all proceedings, their resources are limited. California's trial courts in particular face ever-increasing civil and criminal dockets without any guarantee of corresponding, additional funds for court services—judges, judicial staff, and clerk's office personnel—to meet the demand. Today, no less than in the past, the opportunity for joinder with its attendant efficiencies provided by section 954 is integral to the operation of our public court system. Manifestly, severance of properly joined charges denies the state the substantial benefits of efficiency and conservation of resources otherwise afforded by section 954.

 The Court of Appeal erred, initially, by failing to take into account these general benefits in its consideration of whether the advantages of joinder were sufficiently substantial to outweigh any possible spillover prejudice to defendant, and further erred by concluding that the benefits of joinder were minimal. Quite to the contrary, the benefits of joinder were very substantial. (*Bean, supra,* 46 Cal.3d 919, 939–940; see also *Frank, supra,* 48 Cal.3d 632, 639; *Mason, supra,* 52 Cal.3d 909, 935; accord, *Richards, supra,* 906 P.2d 222, 227; *Bythrow, supra,* 790 P.2d 154, 158–159.) On the record before us, after considering the factors set out above, we conclude that defendant has "failed to carry his burden of making the clear showing of prejudice required to establish that the trial court abused its discretion in declining to sever the [two] charges." (*Alcala, supra,* 43 Cal.4th 1205, 1227.)

## C

 "We have held that even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 851 [48 Cal.Rptr.3d 1, 141 P.3d 135] [finding no such violation]; accord, *People v. Zambrano* (2007) 41 Cal.4th 1082, 1130 [63 Cal.Rptr.3d 297, 163 P.3d 4] [same]; *Mason, supra,* 52 Cal.3d 909, 935–936 [same]; see also *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1084–1086 (*Bean II*) [finding such a violation]; see generally *United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8 [88 L.Ed.2d 814, 106 S.Ct. 725] ["[M]isjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."].)

Although defendant asserts that "the leitmotiv of the People's theory at trial"—and especially in closing argument—"was that whoever committed one of the murders must have committed the other as well," various factors lead us to conclude that defendant has not met his high burden of establishing that the trial was grossly unfair and that he was denied due process of law.

 As noted above, we assume for purposes of analysis that the evidence underlying the Rigby and Olson charges would not have been cross-admissible at separate trials on the issue of *identity*, and therefore also assume that the evidence could not properly be considered by the jury for that purpose at defendant's joint trial. The circumstance that the jury was not specially instructed at the joint trial in this case to restrict its consideration of the evidence to the issue of defendant's intent as to each charge (and that it should not employ that evidence to establish defendant's identity as the perpetrator in both cases) is a *factor* in our assessment of whether the

resulting trial was grossly unfair, but standing alone the absence of such a limiting instruction does not establish gross unfairness depriving defendant of due process.

■ Appellate courts have found " 'no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials.' " (*Bean II, supra,* 163 F.3d 1073, 1085, quoting *Drew v. United States* (D.C. Cir. 1964) 118 U.S. App.D.C. 11 [331 F.2d 85, 91].) Here as well, the evidence underlying the Rigby and Olson charges was relatively straightforward and distinct, and as noted, *ante,* in part I, and summarized in footnote 14, the evidence related to each charge was independently ample to support defendant's conviction of both crimes. Nor was there any great disparity in the nature of the two charges—the facts pertaining to each crime, compared to the other, were not likely to unduly inflame the jury. Nor, contrary to defendant's assertion, is it clear that the evidence underlying one charge (the Olson murder) was significantly weaker than that underlying the other (the Rigby murder). Finally, the jury was instructed on the elements of murder, on the burden of proof for conviction, and—consistently with defense counsel's closing argument to the jury, stressing the need to consider each charge separately and to avoid bootstrapping—that each count charged a distinct offense that must be separately decided.[18] These instructions mitigated the risk of any prejudicial spillover (*Geier, supra,* 41 Cal.4th 555, 578–579), and indeed it appears that the jury in fact was able to follow the instructions and to compartmentalize the evidence presented in the two cases: The circumstance that the jury found defendant guilty of only second degree murder as to Olson, while finding him guilty of the first degree murder of Rigby, "suggests that the jury was capable of differentiating between defendant's various murders; no improper spillover effect is evident here." (*Ruiz, supra,* 44 Cal.3d 589, 607; accord, *Richards, supra,* 906 P.2d 222, 227; *Bythrow, supra,* 790 P.2d 154, 159.) Considering the proceedings as a whole, we conclude that defendant's trial was not grossly unfair.

## IV

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for proceedings consistent with this opinion.

Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[18] On the latter point, the jury was instructed, pursuant to CALJIC No. 17.02: "Each Count charges a distinct crime. *You must decide each Count separately.* The defendant may be found guilty of either or both of the crimes charged in Counts One and Two. Your finding as to each Count must be stated in a separate verdict." (Italics added.)

**KENNARD, J.,** Concurring and Dissenting.—In this noncapital case, defendant James Daniel Soper was charged with two murders committed four months apart. The trial court denied a pretrial defense motion to sever the murder charges, ruling that evidence of the two homicides would be cross-admissible on the issues of identity and intent even if the charges were tried separately. At the trial, the jury was allowed to consider the evidence of each murder to establish both identity and intent as to the other murder, and it convicted him of both crimes. On defendant's appeal from the resulting judgment, the Court of Appeal reversed, holding that the two crimes were insufficiently similar for cross-admissibility on the issue of identity, that under Evidence Code section 352 the risk the jury would misuse the evidence to prove identity outweighed its probative value on the issue of intent, that without cross-admissibility the prejudice resulting from joinder outweighed the benefits of joinder, that the trial court therefore had erred in denying the motion to sever, and that this error required reversal of defendant's conviction. This court granted review.

I join the majority in reversing the Court of Appeal's judgment. I agree with the majority that the trial court did not err in denying defendant's motion to sever the charges relating to the murders of George Rigby and James Olson and that joinder of those charges for trial did not result in gross unfairness depriving defendant of due process of law. I agree with the majority that in hypothetical separate trials, evidence of the two murders would have been cross-admissible on the issue of defendant's identity as the perpetrator of both murders, as well as on the issue of defendant's intent when he inflicted the blows that killed the two victims.

I write separately because, unlike the majority, I see no reason to assume, in analyzing defendant's contentions, that evidence of the two murders would *not* have been cross-admissible on the issue of identity in hypothetical separate trials. (Maj. opn., *ante*, at pp. 778–779.) Nor am I able to conclude, *if that assumption is made*, that the trial court ruled correctly in denying defendant's motion for severance or that joinder of the two murder counts for trial did not result in gross unfairness depriving defendant of due process of law.

## I

To prove that a defendant committed a charged offense, the prosecution may introduce evidence that the defendant has committed a similar offense, but only if the two crimes shared common features that are sufficiently distinctive to support an inference that the same person committed both. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757].) This court has said that for evidence of another crime to be admissible

on the issue of the perpetrator's identity, the similarities between the two crimes must be " 'so unusual and distinctive as to be like a signature.' " (*Ibid.*, quoting 1 McCormick on Evidence (4th ed. 1992) § 190, p. 803.) It must be remembered, however, that it is the combination of features, and not any individual feature, that must be highly distinctive. (See, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 852 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Roldan* (2005) 35 Cal.4th 646, 706 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

Here, in both the Rigby and the Olson homicides, the victim (1) was a homeless man (2) who was killed at his own campsite (3) while lying on his back (4) by a single blow (5) to the head (6) with a heavy object (7) that the killer both found and left at the scene. Moreover, the killings occurred only two to three miles and four months apart, and defendant's fingerprints were found at both campsites. Considered separately, none of these features is highly unusual or distinctive; but the many common features, viewed together, form a pattern that is distinctive and unusual enough to be like a signature. Accordingly, in my view, the trial court did not abuse its discretion when it concluded that evidence of the two murders was cross-admissible on the issue of defendant's identity as the perpetrator of both. Because a lesser degree of similarity is required for cross-admissibility on the issue of intent (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402), it follows that evidence of the two murders was cross-admissible on that issue as well.

If evidence of two crimes would be fully cross-admissible in separate trials, that circumstance alone is normally sufficient to eliminate any possibility of prejudice from joining the charges for trial. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221 [78 Cal.Rptr.3d 272, 185 P.3d 708]; *People v. Carter* (2005) 36 Cal.4th 1114, 1154 [32 Cal.Rptr.3d 759, 117 P.3d 476].) This case contains no unusual circumstance that would preclude application of the normal rule. Therefore, the conclusion that evidence of the Rigby and Olson murders would have been fully cross-admissible on the issues of identity and intent in hypothetical separate trials is sufficient to establish both that the trial court did not err in denying defendant's pretrial severance motion and that the resulting trial on all charges did not result in such gross unfairness as to deny defendant due process of law. On this basis, I join the majority in reversing the Court of Appeal's judgment and remanding the matter to that court for further proceedings.

## II

Rather than taking the simple and direct analytic road I have described, the majority chooses to assume that in hypothetical separate trials of the Rigby

and Olson murders the prosecution's evidence against defendant would *not* have been cross-admissible on the issue of his identity as the perpetrator of those murders. The majority makes this assumption even though it professes to "agree with the People that the evidence appears to be cross-admissible on the issue of identity." (Maj. opn., *ante,* at p. 779.) After making the assumption of non-cross-admissibility, the majority nonetheless concludes, by means of a labored analysis, that the trial court properly denied the severance motion (*id.* at p. 783) and that the joint trial on these charges, at which the jury was permitted to consider the evidence of each murder in deciding whether defendant committed the other murder, was not grossly unfair to defendant (*id.* at p. 784). I am not persuaded.

As I have explained, the many common features of the two murders, considered together, were so distinctive and unusual as to strongly support an inference that the same person committed both. If the evidence were not cross-admissible on the issue of the perpetrator's identity, this powerful inference would produce a correspondingly grave risk that the jury would be unable to obey an instruction not to consider the evidence for this purpose. I am unable to conclude that this grave risk of prejudice to defendant would have been outweighed by the benefits of joinder. For this reason, I question the majority's conclusion that even if evidence of the two murders were not cross-admissible on the issue of identity, despite their many common features forming a distinctive pattern, it would have been proper for the trial court to deny defendant's severance motion.[1]

The majority's unnecessary and unrealistic assumption that evidence of the two murders was not cross-admissible on the issue of identity would similarly raise grave doubts about the fairness of defendant's trial because, contrary to the majority's assumption, the prosecutor at that trial argued to the jury that the many common features of the two murders proved that the same person had committed both, and the trial court's instructions allowed the jury to use that method of reasoning in determining defendant's guilt. Had that method of reasoning been impermissible, as it would necessarily have been under the majority's assumption, the fairness of defendant's trial would have been seriously compromised. (See *People v. Ewoldt, supra,* 7 Cal.4th at p. 404 [acknowledging that other-crimes evidence always involves an inherent and substantial risk of prejudice].)

---

[1] In concluding that, in the absence of full cross-admissibility, the benefits of joinder would have outweighed the grave risk of prejudice to defendant, the majority cannot rely on the deference that an appellate court would normally give to the trial court's determination of that issue. Because the trial court concluded, as have I, that evidence of the two murders was fully cross-admissible, it never undertook that weighing process.

Thus, I do not join the majority in its analysis of the issues under review, but, for the reasons I have set forth earlier, I do join the majority in reversing the Court of Appeal's judgment.