Filed 7/3/14  P. v. Leon CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B244143 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. SA072260) |
| CARLOS LEON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  James R. Dabney, Judge.  Affirmed.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Carlos Leon appeals from the judgment entered upon his conviction by jury of first degree murder (Pen. Code, § 187, subd. (a),[1] count 1), attempted murder (§§ 664, 187, subd. (a), count 2), and shooting at an inhabited dwelling (§ 246, count 3). The jury also found true firearm allegations as to all counts (§ 12022.53, subds. (b)-(d)), and a great bodily injury allegation (§ 12022.7, subd. (b)) as to count 2. The trial court sentenced appellant to a mandatory term of 75 years to life in state prison, plus a life term.

Appellant contends that the trial court abused its discretion and violated his right to due process when it denied his motion to sever the murder count from the remaining charges. Appellant also seeks review of the trial court's in camera hearing pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

We find no abuse of discretion or due process violation. Additionally, we find no abuse of discretion with respect to the in camera hearing. We affirm the judgment.

## FACTUAL SUMMARY

### Prosecution Case

#### *The Magallanes Shooting (Counts 2 and 3)*

On October 31, 2008, Maria Guadalupe Magallanes lived with her husband, her sister, and her mother on Coolidge Street in Los Angeles. Magallanes had a son named Arnulfo, who went by the nickname "Ernie." Appellant and Ernie worked together at UCLA where they became friends. Appellant visited Ernie on a number of occasions while Ernie lived at his parents' home on Coolidge Street. Appellant sometimes brought an animal with him when he visited. Magallanes referred to the animal as a "rat."

At approximately 9:00 p.m., Magallanes was in the kitchen washing dishes when she heard a knock on the door. Magallanes believed it was children trick-or-treating and opened the door. Five people wearing "rabbit" masks were standing at the door. One of them said, "Is Ernie home?" Magallanes recognized appellant's voice. Magallanes said that Ernie was not at the house. Appellant asked, "Are you Ernie's mom?" and then said

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

he was there to "collect a debt." Appellant shifted his mask and Magallanes saw and recognized appellant's face. Appellant pulled out a gun, pointed it at Magallanes, and shot at her several times. Magallanes went to the bedroom where her husband who had been sleeping called 911. Magallanes told her husband that the people at the door were looking for Ernie. She described the shooter as the man who was a friend of Ernie and the one "that had a rat." Magallanes was rushed to the hospital where she became unconscious and remained in a coma for 39 days.

Los Angeles Police Department (LAPD) Detective Charles Scott Walton responded to the crime scene and found a cartridge casing on the driveway. He examined the front door of the location for "evidence of bullets and bullet trajectories." On November 4, 2008, LAPD Criminalist Marissa Bowen recovered the cartridge casing from the driveway and also recovered two expended projectiles from the wooden door of the residence. On April 9, 2009, a few days after being released from hospital, Magallanes spoke with LAPD Detective Kevin Reynolds regarding the shooting. Magallanes was shown a six-pack photographic lineup and identified appellant as the shooter.

Tina Ceniceros was appellant's girlfriend and they had two children together. While she was in a relationship with appellant, she started a sexual relationship with Ernie. Her relationship with Ernie ended when Ernie found out she was pregnant. Ceniceros moved back in with appellant. Sometime after moving back in with appellant and before the Magallanes shooting, Ceniceros's cell phone went missing. The cell phone contained text messages wherein Ceniceros and Ernie discussed their sexual relationship. Ceniceros testified that appellant owned a ferret that looked like a white rat.

### *The Medina Murder (Count 1)*

In 2009, Deborah Jackson was the Director of Neighborhood Services for the City of Lynwood. Adolfo Medina was the parking superintendent and oversaw the ground's maintenance and landscaping services for the City of Lynwood. Appellant was an employee within Jackson's department and under Medina's supervision. In June 2009, appellant requested a meeting with Jackson. Medina told Jackson that appellant had

3

requested time off and Medina had denied the request because his department was short-staffed. On June 17, 2009, Jackson met with appellant, Medina, and Alfredo Lopez, the Director of Human Resources for the City of Lynwood. Medina left the meeting after appellant questioned the need for him to be there. Jackson asked appellant to wait in the hallway while she spoke to Lopez. When she went to look for appellant, he had left and she never saw him again. Appellant never returned Jackson's telephone calls and never returned to work.

Appellant told Ceniceros about the meeting with Jackson, Lopez, and Medina, and how he feared he would be laid off because of Medina. Appellant referred to Medina as a "motherfucker" and a "stupid ass." Israel Mendoza was a coworker of appellant's under Medina's supervision. Appellant told Mendoza that Medina was an "asshole" and on one occasion told Mendoza "that he wanted to collect money so that he [could] get a hit man for Adolfo."

On July 1, 2009, at approximately 5:30 a.m., a small white pick-up truck entering the driveway near Bateman Hall on the property of Lynwood City Hall was captured on surveillance video. Medina lived a few minutes away from Bateman Hall and usually left for work between 5:15 and 5:20 in the morning. Shortly after 6:00 a.m., Jaime Martir was flagged down by a garbage truck driver as he drove to work in the vicinity of Lynwood City Hall. The garbage truck driver said he saw a man that appeared to have been hit by a vehicle because the man was bleeding and there was blood on the bumper of the vehicle. The garbage truck driver asked Martir to call 911 because he did not speak English. Martir approached the area and saw a man, later identified as Medina, lying on the ground near a white City of Lynwood truck, that had the engine still running. There was blood behind Medina's head, around his body, behind the truck, and on the bumper. Paramedics arrived at the scene and Medina was pronounced dead at 6:32 a.m.

Los Angeles Sheriff's Department (LASD) Deputy Arnulfo Loreto responded to the crime scene. Deputy Loreto observed a .22-caliber expended bullet casing and an unexpended casing near Medina's body which were later booked into evidence by Deputy Ray Davidson of the LASD Scientific Services Bureau. LASD Homicide

4

Investigator Ralph Hernandez interviewed the garbage truck driver, Martir, and a homeless man. Based on information he gathered at the crime scene, appellant was a person of interest.

At approximately 9:00 a.m. LASD Deputy Joseph Cabral and other officers set up surveillance at appellant's residence. Appellant left the residence and entered a vehicle accompanied by Ceniceros and small children. LASD Deputies Edgar Bonilla and Juan Rodriguez followed appellant for a few blocks. At approximately 1:00 p.m., appellant was pulled over for a traffic violation. Appellant was asked if he had any weapons in the car and he told Deputy Rodriguez that he had a gun in the trunk. Deputy Rodriguez searched the trunk of the car and recovered a Ruger .22-caliber semiautomatic pistol inside a black backpack. He also recovered a pocketknife, rubbing alcohol, a black ski mask, and a black beanie, from the trunk of appellant's car. Ceniceros testified the Ruger pistol belonged to appellant because she had previously seen it locked away under their bed. Appellant's residence was searched pursuant to a search warrant and officers recovered a gun cleaning kit that fit a .22-caliber gun.

Deputy Dale Falicon was a 31-year veteran of the LASD assigned to the firearms identification division. On July 2, 2009, he test fired and examined the Ruger pistol recovered from appellant. He compared the gun's ballistics with the live cartridges and expended casings recovered from both the Medina and Magallanes cases, and the projectile recovered from the coroner's office. He testified that all of the items were fired from the Ruger semiautomatic pistol recovered from appellant. One expended projectile recovered from the Magallanes residence was too badly damaged to conclusively identify or eliminate.

On July 3, 2009, Deputy Medical Examiner Pedro Ortiz of the Los Angeles County Coroner's Office conducted Medina's autopsy and determined that Medina sustained 26 wounds to his body, two of which were fatal. Medina had 15 injuries produced by a sharp object consistent with a screwdriver, 13 of those wounds were to the head including one fatal one to the right side of the head. Medina also suffered 10 blunt force trauma injuries and a fatal gunshot wound to the right side of his back. Medina had

5

no defensive wounds.  The bullet that fatally injured Medina had fractured a right posterior rib and then perforated Medina's liver, pancreas, inferior vena cava, and aorta. Ortiz recovered the projectile from Medina's abdomen.

**Defense Case**

LAPD Officer Manuel Gutierrez interviewed Magallanes on the night of the incident.  Magallanes told Officer Gutierrez that someone knocked on her door, she opened the door partially, and a man with a mask shot her through the security door.  In April 2009, LAPD Detective Robyn Salazar took a statement from Magallanes. Magallanes told Detective Salazar that on the night of the shooting four people were standing in front of her wearing "Scream" masks.  Detective Salazar wrote in her report, "made popular by the series of horror movies by the same name."

## DISCUSSION

I.    **Appellant's Convictions for Murder and Attempted Murder**

    *A.    Contention*

Appellant contends the trial court erred by denying his motion to sever the Medina murder (count 1) from the crimes against Magallanes (counts 2 and 3).  Appellant contends "there was no shared evidence, no shared witnesses, and no similarity between the two offenses to be cross-admissible at separate trials." He contends the prejudice resulting from trying the two cases together "was immense and assured appellant's conviction on both offenses."

    *B.    Relevant Legal Principles*

Section 954 governs the issue of joinder of counts and it provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of *the same class of crimes or offenses*, under separate counts, . . . ."  (Italics added.)  As appellant concedes, murder and attempted murder are of the same class of crimes within the meaning of section 954. (*People v. Jenkins* (2000) 22 Cal.4th 900, 947.)  The statutory requirements for joinder thus being satisfied, appellant "'can predicate error in denying the motion only upon a clear showing of potential prejudice.  [Citation.]  We review the trial court's ruling on the

6

severance motion for abuse of discretion.' [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 855.)

"'Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

### C. Analysis

#### (i) Cross-Admissibility of the Evidence

Appellant vigorously argues the evidence in the Medina murder and the Magallanes attempted murder was not cross-admissible. Initially we note "even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion. [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 557, overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) However, here, the same gun was used in both offenses. "Joinder is generally proper where a specific weapon is common to more than one crime." (*Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 942.) The testimony by ballistics expert Falicon regarding the live cartridge, fired casings, and fired bullets, collected from *both* crime scenes was cross-admissible to show they matched the Ruger semiautomatic pistol recovered from appellant. Further cross-admissible testimony was provided by Ceniceros who testified that she knew appellant owned the gun because it used to be hidden underneath their bed.

### (ii) Whether the Charges Were Likely to Inflame the Jury

Appellant concedes "that both cases were extremely violent crimes involving a clear intent to kill" but nevertheless argues that combining them was likely to inflame the jurors against him. We are not persuaded. The authority upon which appellant relies discusses the effect of joining gang killings. In those cases there is the risk that a jury would be prejudiced by "the highly publicized phenomenon of gang warfare in Southern California which would be on trial as much as the defendant." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 453.) That is not the case here. Appellant fails to sufficiently distinguish between the shooting of an elderly woman through a screen door on Halloween night who believed she was about to dispense candy to children and an attack using a gun, a screwdriver, and blunt force on an unsuspecting parking superintendent about to begin his day's work. Simply put, both crimes were violent and senseless and did not unduly inflame the jury.

### (iii) The Relative Strength of the Cases

Appellant asserts that the prosecution was allowed to join its "weak" case concerning the Magallanes shooting with the "strong" case as to the Medina murder. Appellant focuses his argument on the delay by Magallanes in identifying appellant as the shooter. However, right after being shot, Magallanes described appellant to her husband as the man who was a friend of their son Ernie and the one who had a "rat." Magallanes remained in a coma for 39 days following the shooting but positively identified appellant from a six-pack after regaining consciousness. Furthermore, Magallanes testified at trial that she recognized appellant's voice and saw his face on the night of the shooting. Considering Magallanes's identification of her attacker, the corroborating testimony provided by Ceniceros that she had been having a sexual relationship with Ernie while she was appellant's girlfriend, and the ballistics testimony connecting the firearm used to that found on appellant, the joinder of the Medina murder did not bolster an otherwise weak case.

8

After examining the four factors,[2] we conclude that appellant failed to carry his burden of clearly establishing "a potential for prejudice sufficient to warrant separate trials." (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.) Joinder did not result in gross unfairness amounting to a denial of due process. (*People v. Soper* (2009) 45 Cal.4th 759, 783.) The trial court's denial of appellant's motion to sever the charges did not constitute an abuse of discretion.

## II.    The *Pitchess* Motion

Appellant also requests that we independently review the sealed transcript of the in camera proceedings on his *Pitchess* motion, which we have done. The trial court's findings during that review, as reflected in the sealed transcript, were sufficient to permit appellate review of its ruling. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229, 1232.) We find no error in the trial court's ruling at the in camera hearing.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J. *

FERNS

We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ

_____

[2]    The death penalty was not implicated here and that factor is nonexistent.

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.