Filed 7/25/14  P. v. Gladney CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANKLIN D. GLADNEY,<br><br>    Defendant and Appellant. | D064194<br><br><br>(Super. Ct. No. SCN295896) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Julie L. Garland, Assistant Attorneys General, Peter Quon, Jr. and Parag Agrawal, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Franklin Demetrius Gladney of four counts of robbery (Pen. Code,[1] § 211; counts 1, 4-6) and one count of burglary (§ 459; count 3), and found him not guilty of one count of attempted robbery (§§ 664, 211; count 2). The court sentenced Gladney to a total prison term of five years.

Gladney contends the court prejudicially erred by denying his motion to sever the charges, thus violating his constitutional right to due process. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Count 1 Robbery*

On June 5, 2011, at approximately 4:15 a.m., Gladney entered the Holiday Inn Express in Oceanside and pointed a black gun in the face of Nancy Diaz, a front desk employee. Gladney was dressed in all black clothing including a sweatshirt, pants, gloves, and a mask that only exposed his eyes. Diaz gave Gladney approximately $130 in bills, and Gladney left the hotel. Diaz described Gladney as "tall" and "skinny." Although Diaz had previously told police she thought Gladney was Hispanic because of his accent, at trial she testified that she was uncertain of Gladney's ethnicity. She explained that when she had spoken to police initially she was "really, really nervous."

*Count 2 Attempted Robbery*

On June 12, 2011, at approximately 5:10 a.m., a man entered the Extended Stay America Hotel in Oceanside and, while standing outside a locked glass door, pointed a gun at Lucia Nava, an employee who was inside the hotel lobby cleaning a window. This

---

1    All statutory references are to the Penal Code unless otherwise stated.

man was dressed in all black clothing including a hooded sweatshirt, pants, gloves, and a ski mask that only exposed his eyes. Nava immediately hid in a storage closet. Nava described this man as "tall" and "skinny." Nava thought this man was "Black."

*Count 3 Burglary*

On July 16, 2011, at approximately 4:12 a.m., James Cushing, a night auditor, was in a back office of a Carlsbad Hampton Inn and saw on the surveillance monitor that Gladney had entered the lobby, taken money from the front desk cash drawer, and exited the hotel. Gladney stole approximately $230 in bills. Gladney was dressed in all dark clothing including a hooded sweatshirt and pants. Cushing described Gladney as a "thinner person." Cushing could not determine Gladney's ethnicity.

*Count 4 Robbery*

On August 6, 2011, at approximately 3:55 a.m., Gladney used an employee back room to enter the Residence Inn Marriott in Carlsbad. He pointed a dark gray or black gun at Heather Bosch, the night auditor. Gladney demonstrated familiarity with the hotel's layout by demanding Bosch get cash from the front lobby. Gladney was dressed in all black clothing including a hooded sweatshirt, pants, gloves with a white skeleton bone design, and a mask that only exposed his eyes.

Gladney asked Bosch if she had any "drops," pointing to a nearby safe with his gun. When Bosch indicated she had not heard him, Gladney changed his request to "drugs." Bosch thought the initial request was significant because among hotel employees, drops referred to extra cash that the attendant removed from the front desk and placed in a safe. Bosch gave Gladney approximately $270 in bills. Bosch described

3

Gladney as a "taller" and "skinny" person.  Bosch thought Gladney was a "very tan, White male."  Bosch testified Gladney had worked with her at the hotel at one point.  The hotel's general manager also testified Gladney had worked at the front desk and as a part-time night auditor from October 2008 to September 2010.[2]

*Count 5 Robbery*

On August 11, 2011, at approximately 9:35 p.m., Gladney again entered the Extended Stay America Hotel in Oceanside.  He pointed a black gun in the face of Josephine Perez, a front desk employee, and demanded money.  Gladney was dressed in all black including a jacket with a white zipper and white drawstrings, pants, gloves, and a mask that only exposed his eyes.  Perez gave Gladney money in bills and started taking out quarters, but Gladney said, "no change."  Perez described Gladney as "tall" and "skinny."  Perez thought Gladney was a "medium color" "African-American."

*Count 6 Robbery*

On August 24, 2011, at approximately 9:38 p.m., Gladney entered the Residence Inn by Marriott in Oceanside, demanded money, and pointed a black gun in the face of Justine Farley, also known as Justine Zechter, a front desk employee.  Gladney was dressed in a hooded long-sleeved sweatshirt with a zipper and drawstrings, pants, gloves, and a ski mask that only exposed his eyes.  Gladney took money in bills and then left the hotel.  Farley described Gladney as "tall" and "thin."  Farley could not determine Gladney's complexion or ethnicity.

---

[2]    Separately, a manager testified Gladney had worked at the Hampton Inn in San Marcos as a night auditor from April 2011 to August 2011.

At approximately 9:50 that night, Mary Helper was on the balcony of her friend's apartment near the Residence Inn by Marriott. Helper saw a Black, skinny man dressed in a dark hooded sweatshirt walking down a hill through some bushes. This man walked to a parking lot, entered a dark car, backed out with his lights off, and drove away quickly. Helper's friend told police that he believed the car was a "mid-2000 black Ford Mustang." A bystander in the parking lot testified she saw a black Mustang drive back and forth a few times.

*Police Investigation and Gladney's Arrest*

At trial, different witnesses identified Gladney from images taken from video surveillance cameras, and from his body build and attire during the different crimes. Further, expert analysis of Gladney's cell phone records placed him near each crime scene around the times of the crimes.

During the crime spree, the Oceanside Police Department issued a bulletin to all police officers to look for a "hoodie hotel bandit," and provided them his physical description and that of his car. On August 27, 2011, a few days after the last crime occurred, Oceanside Police Department Officer Larry Weber stopped a black Mustang. Gladney was the driver and wore a black sweatshirt with a white zipper and white drawstrings. In Gladney's car, Officer Weber found black-and-white gloves, a black cloth that looked to him "like a t-shirt that may have been cut that could be used to cover your face," and a black plastic gun.

Gladney was 23 years old, six feet one inch tall, and weighed 170 pounds when he was booked. Oceanside Police Department Sergeant Billy Weese testified Gladney

5

resided within a block of the Extended Stay America Hotel and the Holiday Inn Express. In Gladney's residence, Sergeant Weese found a business card from the Residence Inn, the location of one of the crimes. Police also found a black beanie and a black "do-rag," which Sergeant Weese described as a light material worn on the head. Sergeant Weese further noted Gladney was not at his place of employment during the times the different crimes took place.

*Gladney's Severance Motion*

Gladney moved in limine to sever the charges for trial, arguing that joinder would be substantially prejudicial. He acknowledged that the complaint alleged "the same offenses or same class of crimes," but claimed they were "not connected together in their commission." He pointed out the crimes occurred on different dates, at different times, and involved different witnesses and evidence. Gladney also claimed the evidence for each charge was not cross-admissible and the court improperly joined weaker cases with stronger cases.

The trial judge, who was different from the magistrate judge, reviewed the photos of the suspect taken from surveillance cameras at the different hotels and denied the motion to sever, ruling: "There's a very, very strong probability that the person who committed one of these offenses committed all the offenses" because of the perpetrator's distinctive apparel and modus operandi, and all crimes took place at a hotel within certain times and in a relatively small geographical area. The court also ruled that evidence of a

6

positive identification from one of the charges would be cross-admissible regarding the other charges under Evidence Code section 1101, subdivision (b).[3]

The court stated the evidence would be cross-admissible to show intent and identification.  Specifically, it found "sufficient similarity for identification to the extent that if one person was identified as committing one [crime], that person could be convicted of all six, because they are so identical."  The court further ruled:  "The evidence of identification . . . the vast majority of it is the same for all six counts.  The stop of the car, the fact that Mr. Gladney is wearing these types of clothes, the fact that he has the handgun, the hoodie, the pants that are consistent with the later robberies, all of that would be used six times over in each trial to show identification of the individual for each one of these six counts."

## DISCUSSION

Gladney contends the trial court abused its discretion and violated his rights to due process and a fair trial under the state and federal Constitutions by failing to sever the charges, thus permitting "a series of weak counts [to be] joined to help create a more convincing whole."  Gladney argues there was no cross-admissibility of evidence to justify joinder of the charges, although he concedes the perpetrator wore a distinctive

---

3    Evidence Code section 1101, subdivision (b) states:  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

7

sweatshirt in each crime. But he asserts no evidence was introduced as to the uniqueness of that sweatshirt. Gladney also relies on a statement the magistrate judge made at the preliminary hearing regarding section 1118.1.[4] Specifically, he argues, "The absence of any direct identification, the variance in the description of the ethnicity of the suspect, the absence of any direct link to [himself], and the magistrate's comment that the evidence would not sustain a section 1118.1 challenge . . . , all indicate an abuse of discretion in denying the motion."[5]

The People counter that the trial court properly denied Gladney's motion to sever the counts because of 13 commonalities among the charged offenses: "(1) the crimes

---

[4]  Section 1118.1 states: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

[5]  At the preliminary hearing, defense counsel argued the People's evidence was weak, and "the best they have done is said they cannot eliminate Mr. Gladney as a suspect. And that's it. [¶] . . . They have speculation and that's it. So they're asking you to bind over on the most serious of charges that you have, to ask yourselves [*sic*] would or should—and I know this is a different standard. It shouldn't result in a conviction." The court responded, "Oh, I agree with that. It wouldn't get past [section 1118.1]." Nevertheless, the court held Gladney to answer to the charges based on the similar clothing used in the different crimes; his approximate height and age being similar to that testified to; his car matching witnesses' descriptions; and the fact that Gladney had worked in the hotel industry and the robber knew where the money was kept in hotel lobbies. The preliminary hearing judge's comment was not dispositive on the severance issue because the case had not proceeded to trial, and there was no motion for entry of a judgment of acquittal; rather, the context of the comment was a preliminary hearing. Moreover, the court, applying a different legal standard, did find the evidence sufficient to require Gladney to be held answerable on the charges.

8

targeted the same types of establishments—hotels; (2) all six target locations were in a relatively small geographical area; (3) four of the six charges occurred between 3:52 and 5:10 a.m., and two (counts 5 and 6) were around 9:30 [p.m.], but only after appellant found the doors to be locked during the attempted robbery charge and returned at a time when the doors would not be locked; (4) the perpetrator in all charges was wearing the same distinctive black sweatshirt, black and white shoes and gloves, and had his face covered with black material; (5) the robber carried a black gun; (6) the robber's demeanor was always the same—he was calm and did not yell or panic; (7) the perpetrator always fled on foot; (8) when committing each robbery, the perpetrator made specific, limited requests indicating his familiarity with the operations and the layouts of the establishments; (9) appellant previously worked at two of the locations and during the robbery spree he was employed at a comparable hotel working the same shift as the robbery victims; (10) the perpetrator only took [paper bills]; (11) all victims generally described the perpetrator to be a tall, slender young male; (12) the apparel, similar to what the perpetrator wore in each robbery and which was recorded by surveillance videos of each charge, was found in appellant's car; and (13) appellant's cell phone placed him in close vicinity to all the crimes when they were committed."

A. *Applicable Law*

Under section 954, "An accusatory pleading may charge two or more different offenses connected together in their commission, or . . . of the same class of crimes or offenses . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts

set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722.) The law prefers consolidation or joinder of charged offenses in the interests of judicial economy (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220), and the language "connected together in their commission" in section 954 reflects legislative intent for a "very broad test for joinder." (*Id.* at p. 1217.)

In *People v. Soper* (2009) 45 Cal.4th 759 (*Soper*), the California Supreme Court addressed the legal principles relevant to the severance of properly joined criminal charges. (*Id.* at pp. 771-772.) The prosecution is entitled to join offenses (*id.* at p. 773); thus, "[t]he burden is on the party seeking severance to clearly establish that there is substantial danger of prejudice requiring that the charges be separately tried." (*Ibid.*) To establish that a trial court abused its discretion in declining to sever properly joined charges, the defendant must make a "clear showing of prejudice"; that is, that the ruling fell "outside the bounds of reason." (*Id.* at p. 774.) A party seeking severance must make a *stronger* showing of potential prejudice that outweighs the countervailing considerations of conserving judicial resources and public funds. (*Ibid.*)

10

In determining whether a trial court abused its discretion under section 954, we consider the record before the court when it made its ruling (*Soper*, *supra*, 45 Cal.4th at p. 774), and undertake the following four-factor analysis as outlined in *Soper*: First, we consider the most important factor, the cross-admissibility of the evidence in hypothetical separate trials. (*Id.* at pp. 774-775.) "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citations.] Morever, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*Ibid.*)

"If we determine that evidence underlying properly joined charges would *not* be cross-admissible, we proceed to consider 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] In making *that* assessment, we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the

11

charges converts the matter into a capital case.  [Citations.]  We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state."  (*Id.* at p. 775.)

"[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought:  '*The least degree of similarity . . . is required in order to prove intent.  . . .*  In order to be admissible [to prove intent], the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' "  (*Soper*, *supra*, 45 Cal.4th at p. 776.)  "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.  For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  [Citation.]  'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' "  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)  "The inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.  [Citation.]  [¶]  . . .  [¶]  [T]he likelihood of a particular group of geographically proximate crimes being unrelated diminishes as those crimes are found to share more and more common characteristics."  (*People v. Miller* (1990) 50 Cal.3d 954, 987-989.)

B. *Analysis*

Here, we agree with the trial court that the evidence was cross-admissible to prove intent. A necessary element of the crime of robbery is the intent to permanently deprive the owner of his or her property. (*See People v. Anderson* (2011) 51 Cal.4th 989, 994.) Burglary is committed when a person enters a building with intent to commit a grand or petit larceny or any felony. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041.) When Gladney entered each hotel, his intent in committing all of the crimes was to steal money, as shown by the following circumstantial evidence: Gladney previously worked as a night auditor at two hotels; he was familiar with the operations of the night shift and elected to commit all crimes during that shift, including at a hotel where he had been employed; when he entered each hotel, he wore a mask to conceal his identity; and he carried a gun and demanded money from the night auditors. Such evidence was cross-admissible to prove Gladney's intent for all charges.

Gladney argues that evidence related to intent "would only be relevant, and thus admissible, if the evidence had previously established identity; [here,] it did not." The *Soper* court rejected a similar argument, reasoning: "There is no requirement that it must be conceded, or a court must be able to assume, that the defendant was the perpetrator in both sets of offenses." (*Soper*, *supra*, 45 Cal.4th at p. 778.)

Separately, a significant amount of cross-admissible evidence established Gladney's identity: During each crime, the perpetrator wore a distinctive black hooded sweatshirt with white drawstrings and a white zipper, black and white shoes and gloves, and a face covering of black material. The suspect carried a black or dark handgun in

13

each instance. Witnesses described the perpetrator as a tall and skinny man. When Gladney was arrested three days after the last crime, he was wearing clothes matching those worn by the perpetrator. Booking information showed Gladney was young, tall, and thin when arrested, matching the trial witnesses' descriptions. Some witnesses indicated the suspect was Black, had a tan, or had a medium complexion. Finally, within a three-month span, the perpetrator carried out all crimes during the night shift and at hotels that were "geographically proximate." Based on analysis of his cell phone, Gladney was near all crime scenes at the relevant times. Testimony regarding each incident was therefore cross-admissible to prove Gladney's identity on all charges.

Contrary to Gladney's claim, the witnesses' conflicting testimony regarding the suspect's ethnicity was not sufficient to sever the charges because their testimonies "[did] not contradict the shared distinctive marks" of Gladney's attire in the different crimes. (*Verzi v. Superior Court* (1986) 183 Cal.App.3d 382, 387-388.) The witnesses' inconsistent testimony is not unexpected in light of the fact that the perpetrator wore a mask, the victims could only see a little bit of his skin, and the incidents lasted only a brief moment, during which the victims were threatened with a gun. But the impact of their inconsistency regarding his ethnicity is vitiated because they gave consistent testimony regarding the perpetrator's clothing and physical build.

Under the circumstances, we conclude Gladney has failed to establish that the trial court's ruling fell outside the bounds of reason. (*Soper*, *supra*, 45 Cal.4th at p. 774.) The court carefully analyzed the issue of severance in light of the relevant law. Such a

14

determination of cross-admissibility "dispel[s] any prejudice and justif[ies] a trial court's refusal to sever the charged offenses." (*Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1221.) Therefore, we need not analyze the remaining factors described above. (*Ibid.*)

Although we find the trial court's denial of Gladney's severance motion proper at the time it was made, "[b]ecause the issue is raised on appeal following trial, we must also consider whether, 'despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law.' " (*People v. Sandoval* (1992) 4 Cal.4th 155, 174.)

There is no prejudicial effect from joinder when the evidence of each crime is simple and distinct. (*Soper*, *supra*, 45 Cal.4th at p. 784.) Here, the evidence underlying the different crimes was relatively straightforward. There was no great disparity in the nature of the six charges. Contrary to Gladney's assertion, the trial court did not combine weaker cases with stronger cases. Further, the trial court correctly instructed the jury with CALCRIM No. 3515 to "consider each count separately and return a separate verdict for each one." We conclude Gladney failed to show that denial of severance deprived him of a fair trial.

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.