Filed 10/2/14  P. v. Smith CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CLAUDE THOMAS SMITH,<br><br>    Defendant and Appellant. | A138710<br><br>(Napa County<br>Super. Ct. No. CR163544) |

After a jury trial, defendant Claude Thomas Smith was convicted of mayhem and other assault crimes committed against his partner in a domestic relationship as well as grand theft against the same victim.  He contends the trial court erred in (1) failing to sever the theft offense and try it separately from the other crimes; (2) imposing a five-year sentence enhancement under Penal Code[1] section 12022.7, subdivision (e); and (3) choosing the aggravated term of eight years for mayhem.  We find no merit in defendant's contentions, and affirm the judgment.

## I.  BACKGROUND

Defendant was charged by information with mayhem (§ 203; count one), assault with intent to commit mayhem (§ 220, subd. (a)(1); count two), assault with caustic chemicals (§ 244; count three), assault with a deadly weapon (§ 245, subd. (a)(1); count four), battery with serious bodily injury (§ 243, subd. (d); count five), inflicting corporal injury on a spouse (§ 273.5, subd. (a); count six), grand theft (§ 487, subd. (a);

---

[1] All statutory references are to the the Penal Code unless otherwise indicated.

count seven), and receiving stolen property (§ 496, subd. (a); count eight).  The information alleged as to several counts that defendant personally used a deadly weapon (§ 12022, subd. (b)(1); counts one, two, five, six) and inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e); counts one, two, three, four, six), and it alleged a prior strike conviction (§ 1170.12, subds. (a)–(d)) and a prior serious felony conviction (§ 667, subd. (a)(1)).  Defendant pleaded not guilty to all counts and denied the special allegations.

A jury trial commenced on March 12, 2013.

## A.  *Prosecution Case*

Defendant and the victim, Joann Maher, had a romantic relationship spanning 40 years, but never married.  They had a 37-year-old son.  Defendant had five adult children from an earlier marriage.  Maher and defendant jointly owned a mobile home in Calistoga and a house in San Francisco.  In 2012, Maher was living in the Calistoga mobile home.  Defendant was working in San Francisco and living in the San Francisco house during the week.  He stayed in Calistoga most weekends.

By October 2012, Maher had decided to end her relationship with defendant, and was planning to move out of their mobile home.  She had met another man and began dating him that month.  Maher had successfully bid to purchase another mobile home in the same mobile home park.  As of October 14, 2012, she had not yet told defendant she was ending their relationship.

Ms. Maher spent the day out with friends on Sunday, October 14, 2012, while defendant remained in the mobile home.  Before leaving, she placed her car keys on the kitchen counter and mentioned to defendant she was not taking them with her because they were too bulky.  Maher had written about her new relationship and mentioned the name of the man she was dating in her journal, which she kept in her car.

Defendant confronted Maher about her new relationship when she returned home on Sunday.  Maher confirmed she was dating someone and told defendant she would be moving out.  Defendant appeared to take the news calmly and did not seem angry.  After defendant left, Maher discovered her journal was missing from her car.

2

The next day Maher got into her car and reached for a plastic bottle of water while she waited for the car to warm up. She immediately noticed the water had an extremely bitter, foul taste. She recapped the bottle and threw it in a trash can when she got to her destination. No one other than defendant had access to her car in that time period.

On October 16, Maher went to sleep around 9:30 p.m. The doors and windows of the mobile home were locked. Around 1:45 a.m., Maher was awakened by feeling someone striking her head with something. The room was dark and she was unable to see her attacker or the object she was being struck with. It felt like plastic. She could hear liquid sloshing and the crack of the plastic bottle. She sat up screaming, and tried to fend off the attacker. After striking Maher around eight times, the attacker fled without saying a word. Maher got up and ran out of the house after the attacker. He followed an exit route from her bedroom through a second bedroom and bathroom and out though a side entrance to the mobile home. Only someone familiar with the home would have been aware of the side entrance. Maher went the other way past the kitchen, and exited out of a side door to the carport. When she reached the carport, she saw a car she believed was defendant's. She knew the license plate on his car and was able to see it, and she was very familiar with defendant's car which he had driven for the past several years. She saw the door close on the car and the back car lights come on before the car started up and sped off.

Ms. Maher's nightgown was wet from the attack, and she began to feel a burning sensation in her eyes, as well as pain in her ear. She went back inside the house and called 911. She told the dispatcher she thought her husband had attacked her.

Officer Perreault was dispatched to Maher's residence. She was injured and frantic. She had a large laceration in the top portion of her right ear, and two large areas of swelling on her right forearm and wrist. Maher, who was a retired nurse, was holding a wet wash cloth to her eyes and complaining of eye pain. As Perreault checked the residence, Maher stated several times she was sure the attacker was her husband and she had seen his car leaving the scene.

3

By the time Maher arrived at the hospital, her skin felt like it was on fire. She had chemical burns on her upper body and both her corneas, and bruising to her face, arms, and legs. She also had a severe laceration to the upper part of her right ear that cut all the way through the cartilage. The treating physician who sutured her ear explained the cartilage rupture was normally a permanent injury. It will not heal or grow back and is only held in place by the surrounding skin.

Evidence collected later that day from the mobile home included Maher's bed sheets, pillow, and pillowcase, which were all wet with liquid, as well as Maher's nightgown. On the floor by the bed, Officer Perreault found a cream-colored, rectangular, plastic container, measuring two inches by four inches by six inches. The label on the bottle indicated it contained sulfuric acid. From his previous employment at Home Depot, Officer Perreault recognized that type of container is for battery acid, and is typically packaged and sold along with a replacement battery for a tractor or motorcycle. He was also familiar with the odor of battery acid. That smell emanated from the bottle and the wet sheets.

Officer Perreault reached defendant on his cell phone at 7:00 a.m. on October 17, 2012, five hours after the attack, and asked defendant to come to Calistoga for questioning. Defendant denied being in Calistoga at the time of the attack. Defendant was arrested after the interview and police searched his house in San Francisco the next day. In a garbage can in defendant's kitchen, Officer Perreault found a cream-colored plastic cap that matched the sulfuric acid bottle. He did not find any bottles fitting with that cap in or around the garbage can. The cap had a funnel tip and vent lid typical of bottles of sulfuric acid sold with batteries. Officers later placed the cap on the acid bottle recovered from Maher's home and found it was a perfect fit. The cap found in defendant's San Francisco home and the bottle recovered from the mobile home are exactly the same color and are made of the same plastic.

Police also found a San Francisco Chronicle newspaper in defendant's car dated October 16, 2012. The newspaper had brown spots later determined to be sulfuric acid stains. Mail addressed to Maher was also found in defendant's car.

4

About a week after the attack, Maher discovered her jewelry was missing. She kept her jewelry in a pouch, secured in a file cabinet in her bedroom. Besides herself, only defendant knew where she kept her jewelry. The last time she recalled seeing the jewelry was during the week before the assault.

Ms. Maher also kept a binder with the deeds to her and defendant's property in another drawer in the file cabinet, and she discovered the deeds were missing from the binder. Also taken from her home were documents about the new mobile home for which her bid had been accepted. She had printed out the documents the morning of October 14, before defendant arrived at the Calistoga home.

About one week after the assault, Maher took a bottle of water from her refrigerator. The bottle had been pushed to the back of the refrigerator when she placed newly purchased bottles in. She noticed the seal of the bottle was broken and there was lipstick on the top, suggesting she had previously opened and sipped from that bottle. When she took a drink from the bottle, however, she experienced the same foul, bitter taste she recalled from the discarded bottle she had taken a sip from in her car. She turned the bottle over to the police.

Chemical analysis of the acid bottle, cap, bed sheets, pillow case, pillow, and nightgown revealed the presence of sulfuric acid. The substances found on the bed sheets, the pillow case, and the newspaper found in defendant's car were all consistent with one another. Chemical analysis of the foul-tasting bottle of water turned over by Maher revealed the water was an extremely basic solution of 11.7 pH, rendering it close to the level California designates as hazardous. The chemist opined the chemical composition and base level of the adulterated water was consistent with someone having added a drain cleaning compound such as Drano to the water.

A wireless technology expert conducted an analysis of cell phone tower records for defendant's cell phone number. That analysis showed defendant was in the area of his house in San Francisco until sometime after midnight on October 17. At 12:45 a.m., defendant's cell phone made a data connection with a Novato cell phone tower that provides service for northbound traffic on U.S. Highway 101. At 1:21 a.m., defendant's

5

cell phone connected to a cell phone tower in Calistoga covering Maher's mobile home park. At 1:58 a.m., defendant's cell phone made a data connection with another tower indicating he was leaving Calistoga, traveling west. At 2:55 a.m., defendant's car was photographed by the automated toll system on the Golden Gate Bridge, reflecting he was traveling south, entering San Francisco.

Officers reviewed defendant's telephone calls made from jail to his daughter, Jinetta Scott. In the calls, defendant discussed Maher's jewelry, which he had given to Scott. Officers obtained a warrant for Scott's home and confronted Scott. She turned over the pouch of missing jewelry and a binder containing the deeds Maher reported missing.

Ms. Maher testified defendant had purchased all of the stolen jewelry items, save for two pieces, an emerald ring and a cameo. An expert appraiser valued the emerald ring at around $1,800. Together, all the stolen jewelry items appraised for over $25,000.

**B. *Defense Case***

The defense rested on the state of the evidence. In closing, the defense argued Maher's memory of the attack and initial identification of defendant's car were unreliable, and defendant was not the person who attacked her. Regarding the grand theft and receiving stolen property charges, the defense argued the evidence was insufficient to prove defendant had intended to make an unconditional gift of the jewelry to her.

**C. *Verdict, Sentencing, and Appeal***

The jury was instructed that count five was a lesser included offense of count one and that counts seven and eight were charged in the alternative. The jury returned guilty verdicts on counts one, two, three, four, six, and seven, and found the enhancements true. The court found true the prior conviction allegations.

On May 2, 2013, the court sentenced defendant to 28 years 4 months in state prison calculated as follows: the high term of 8 years for mayhem, doubled to 16 years because of the prior strike; plus a consecutive term of 16 months for grand theft, representing one-third the midterm, for a total of 17 years 4 months; plus an additional one-year term for the use of a deadly weapon enhancement (§ 12022, subd. (b)(1)), an

additional five-year term for the great bodily injury enhancement (§ 12022.7, subd. (e)), and an additional five-year term for the prior manslaughter conviction (§ 667, subd. (a)(1)). The court stayed sentence on counts two, three, four, and six, pursuant to section 654. Defendant timely appealed.

## II.  DISCUSSION

Defendant contends the trial court erred in (1) denying his motion to sever the assault and theft charges, (2) imposing sentence for the great bodily injury enhancement, and (3) imposing the aggravated term for mayhem.

### A.  *Denial of Severance Motion*

Prior to the trial, defendant moved to sever the grand theft and receiving stolen property charges from the remaining charges alleging assaultive crimes against the person. He argued the theft charges were not in the same class of crimes as the assault charges and the alleged crimes were not connected in their commission for purposes of section 954.[2]  (See *People v. Saldana* (1965) 233 Cal.App.2d 24, 30 (*Saldana*) ["Legislature did not intend the phrase 'two or more different offenses connected together in their commission' to apply to two wholly unrelated crimes merely because they were committed on the same day or even . . . at the same time"].)

### B.  *Relevant Law*

Under section 954, an accusatory pleading may charge two or more different offenses if the offenses are *either* "connected together in their commission" *or* "of the same class." (§ 954; *People v. Soper* (2009) 45 Cal.4th 759, 771 (*Soper*).) The court may nonetheless order separate trials of properly joined charges "in the interests of justice and for good cause shown." (§ 954.) It is the defendant's burden in that case to demonstrate there is a substantial danger of prejudice requiring that the charges be tried separately. (*Soper*, at p. 773.) "Because consolidation ordinarily promotes efficiency, the law prefers it." (*People v. Ochoa* (1998) 19 Cal.4th 353, 409.)

---

[2] Section 954 provides in relevant part that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts . . . ."

7

Assuming proper joinder, a trial court's denial of a motion to sever must be evaluated in light of the facts and circumstances apparent to the court at the time of its ruling, and is reviewed for abuse of discretion. (*Soper, supra*, 45 Cal.4th at pp. 774–775, 776, fn. 10.) If the trial court's ruling is correct at the time it was made, a defendant is only entitled to relief on appeal if joinder actually resulted in " 'gross unfairness' " amounting to a denial of due process. (*Id.* at p. 783.)

The courts have identified certain criteria to provide guidance in ruling upon and reviewing a motion to sever. (*Soper, supra*, 45 Cal.4th at p. 774.) First, "we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*Id.* at pp. 774–775.) Second, if the evidence would *not* be cross-admissible in separate trials, we must take into account the possible prejudicial "spill-over" effect of evidence of other crimes on the jury in its deliberations over the evidence of defendant's guilt for each set of crimes. (*Id.* at p. 775.) We analyze whether some of the charges are likely to inflame the jury against the defendant, or whether a weak case has been joined with a strong case or another weak case "so that the totality of the evidence may alter the outcome" as to the weak or noninflammatory charges. (*Ibid.*) We then balance the potential for prejudice to defendant from a joint trial to the countervailing benefits to the state. (*Ibid.*) These principally include the conservation of judicial resources and public funds. (*Id.* at pp. 774, 782.)

## C. *Application*

As an initial matter, we reject the proposition that the theft and assaultive crimes alleged were not connected in their commission. *Saldana*, cited by defendant, is inapposite. The defendant in *Saldana* was charged with and tried for rape and marijuana possession. (*Saldana, supra,* 233 Cal.App.2d at p. 25.) The only evidence connecting the two offenses was that the marijuana was found in clothing worn by the defendant at the time of the rape. (*Id.* at pp. 29–30.) The Court of Appeal held "[s]uch a showing clearly did not constitute a sufficient basis for consolidation under Penal Code

section 954." (*Id.* at p. 30.) Here, the evidence connecting the two classes of crimes was far stronger than in *Saldana*. The charged theft and assault crimes targeted the same victim, occurred in the same time frame, and sprang from the same motive—punishing and taking revenge on the victim for ending her relationship with defendant.

The requirement that offenses be " 'connected together in their commission' " does not require that the offenses be part of the same transaction or occur at the same time. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218.) All that is required is there exist a " 'common element of substantial importance in their commission.' " (*Id.* at p. 1219.) Thus, in *Alcala* evidence that each of the five charged murders committed over a 19-month period involved sexually motivated assaults sufficiently tied the crimes together to support joinder. (*Id.* at p. 1219.) *Alcala* specifically found that the intent or motivation with which different acts are committed can qualify as a " 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission.' " (*Ibid.*)

The jury could infer from the evidence presented in this case that defendant learned of Maher's relationship with another man on Sunday, October 14, when he was visiting Calistoga for the weekend, and was left alone in the mobile home and had access to Maher's car keys and journal. The jury could also infer it was most likely during this time period when defendant put noxious chemicals in Maher's water bottles in the car and the refrigerator, and when he removed her jewelry, which she last recalled seeing about a week before she was attacked. He took other items having no economic value from Maher's possession at the same time—including deeds for their properties and documents pertaining to Maher's mobile home purchase. All of these events occurred in the same time frame immediately following defendant's discovery that Maher was seeing someone else and ending their relationship. A common thread of substantial importance to all of these acts—as well as to the beating and acid attack a few days later—was animus toward Maher and a desire to hurt and take revenge against her. In our view, the theft and assaultive offenses were properly joined under section 954.

Defendant fails to establish the joinder of the theft offenses substantially prejudiced his defense on the mayhem and other alleged assault crimes. First, we find evidence of the theft charges would have been admissible in a separate trial on the assault offenses under Evidence Code section 1101, subdivision (b). Subject to the trial court's discretion to weigh the probative value of the evidence against its potential prejudicial effect, section 1101, subdivision (b) allows evidence of the defendant's commission of another crime when offered to prove certain relevant facts such as identity, motive, intent, or plan. (*People v. Kipp* (1998) 18 Cal.4th 349, 369, 371.) Evidence of other criminal acts against the same victim is admissible to explain the defendant's motive in committing the charged offense. (See *People v. Kelley* (1997) 52 Cal.App.4th 568, 578–579 [prior molestation of the victim was relevant and admissible in prosecution for stalking to show defendant's motive to place the victim in fear]; see also *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 ["we have frequently held that evidence of other offenses is cross-admissible to prove motive"].) Here, evidence of all of the hostile acts defendant committed against Maher in the immediate aftermath of learning she was seeing someone else, including the theft of her jewelry, would have been admissible to show his motive for attacking her on October 17, 2012. Proof of the presence of a motive is material evidence tending to refute the presumption of innocence. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017.) The admissibility of the theft evidence in a hypothetical separate trial on the mayhem and assault offenses, by itself, refutes defendant's claim the trial court abused its discretion in denying his motion to sever. (*Soper, supra*, 45 Cal.4th at pp. 774–775; see *Zambrano,* at p. 1129 [it is sufficient the assaults were admissible to show motive in the murder case; "two-way" cross-admissibility is not required].)

Even assuming for the sake of analysis the cross-admissibility of the theft evidence was not conclusive of defendant's prejudice claim, neither of the other factors used to evaluate potential prejudice weigh in defendant's favor either. The jewelry theft charges are obviously *less* inflammatory than the mayhem and other assault charges, and

*less* likely than the latter to inflame the jury against defendant. Defendant makes no argument to the contrary. With regard to the relative strength of the theft and assault crimes evidence, we reject defendant's claim that the evidence against him as to the assault crimes was "not overwhelming" whereas the theft evidence was "fairly strong." The mayhem and assault evidence was, in fact, completely compelling. Maher recognized defendant's car and license plate as he was fleeing the crime scene. The cell phone and photographic evidence from the bridge toll system independently placed defendant near the crime scene at the time of the attack—a location he had no innocent explanation for being in at that time of night during a weekday. His false statement to police concerning his whereabouts showed a consciousness of guilt. The bottle cap found in defendant's home, and the acid-stained newspaper found in his car both tied him directly to the crime. Defendant's access to the residence, the lack of forced entry, and the route he took to escape all pointed to him as the perpetrator. Independent of the theft evidence, it is impossible to fairly characterize the case for defendant's guilt on the assault charges as weak.

Defendant fails to demonstrate any substantial danger of prejudice from trying the theft and assault charges together, or any abuse of discretion by the trial court in denying his motion to sever.

**D.** *Great Bodily Injury Enhancement*

Under section 12022.7, subdivision (e)[3] defendant received an additional five-year term as an enhancement to his eight-year sentence for mayhem (which was doubled to 16 years due to his prior "strike" conviction). He asserts "[t]he imposition of sentence for the great bodily injury enhancement constituted an improper dual use of facts since great bodily injury is an element of mayhem."

---

[3] Section 12022.7, subdivision (e) states in relevant part: "Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years."

11

Defendant relies in part on section 12022.7, subdivision (g), but that reliance is misplaced. Subdivision (g) states in relevant part: "Subdivisions (a), (b), (c), and (d) shall not apply if infliction of great bodily injury is an element of the offense." By its terms, subdivision (g) does not preclude a sentence enhancement under subdivision (e) even if great bodily injury is an element of the underlying felony. Subdivision (g) has no application to this case.

Defendant also cites *People v. Pitts* (1990) 223 Cal.App.3d 1547, decided under an earlier version of section 12022.7. *Pitts*, which was not a domestic violence case, held the enhancement for great bodily injury could not be applied to mayhem because great bodily injury was an element of mayhem. (*Id.* at pp. 1559–1560.) Former section 12022.7 read in relevant part as follows: "Any person, with the intent to inflict such injury, who personally inflicts great bodily injury . . . in the commission . . . of a felony shall, in addition and consecutive to the punishment prescribed for the felony . . . be punished by an additional term of three years, *unless infliction of great bodily injury is an element of the offense of which he is convicted*." (Italics added; now subds. (a), (g).) Former section 12022.7 thus contained a *blanket* prohibition against imposition of the enhancement if great bodily injury was an element of the underlying offense. The version of the statute in effect during the commission of the offense in issue here— specifically the language now found in subdivision (g)—excludes enhancements based on subdivision (e) from the prohibition on double use of the fact of personal infliction of great bodily injury. *Pitts* is unpersuasive.

Defendant also cites California Rules of Court, rule 4.420(d), which provides that "[a] fact that is an element of the crime upon which punishment is being imposed may not be used to impose a greater term." The rule applies in the context of selecting a determinate prison term under section 1170, subdivision (b). It does not trump the Legislature's choice of language in section 12022.7, subdivision (g), which authorizes imposition of a great bodily injury enhancement in cases involving domestic violence even if great bodily injury is an element of the underlying felony. (See *People v. Hawkins* (2003) 108 Cal.App.4th 527, 531.)

12

The trial court properly applied section 12022.7.

### E. *Upper Term Sentence for Mayhem*

The trial court stated it was imposing the aggravated term of eight years for mayhem because of "[t]he nature of the crime" and "the methods used by defendant in committing the crime." According to defendant, this violated the principle that a fact constituting an element of the crime cannot be used to impose the aggravated sentence for committing it. (See *People v. Scott* (1994) 9 Cal.4th 331, 350 (*Scott*); Cal. Rules of Court, rule 4.420(d).) Defendant maintains the court's reference to the "nature of the crime" is "akin to saying that the upper term is justified because the crime was mayhem." He argues the "methods used" similarly adds nothing to the elements of the offense in that the methods used in this case were merely "those necessary to commit the offense of mayhem."

The Attorney General points out defendant forfeited this claim by failing to raise it at his sentencing. (See *Scott, supra*, 9 Cal.4th at pp. 352–353 [waiver doctrine applies to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices, including failing to state any reasons or give a sufficient number of valid reasons].) In any event, the nature of and methods used in the attack in this case did exceed the bare elements of the mayhem offense. This was a particularly aggravated and heinous crime. Defendant repeatedly struck the victim's head, severing the ear cartilage, and cruelly doused her face and eyes with sulfuric acid. Defendant's assertion "[t]here was nothing about the 'methods used' by [him] to commit the crime which made it distinctively worse than ordinary" flies in the face of the facts proven at trial. Imposition of an aggravated term was more than justified in this case. (See *People v. Black* (2007) 41 Cal.4th 799, 813 ["the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term"].)

## III. DISPOSITION

The judgment is affirmed.

13

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.